## PIPEFITTERS LOCAL UNION NO. 562 ET AL. v. UNITED STATES

No. 70–74.   Argued January 11, 1972—Decided June 22, 1972

BRENNAN, J., delivered the opinion of the Court, in which DOUGLAS, STEWART, WHITE, MARSHALL, and REHNQUIST, JJ., joined. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., joined, *post*, p. 442. BLACKMUN, J., took no part in the consideration or decision of the case.

*Morris A. Shenker* argued the cause for petitioners. With him on the briefs were *James F. Nangle, Jr., John L. Boeger, Cordell Siegel, Murry L. Randall,* and *Richard L. Daly.*

*Deputy Solicitor General Wallace* argued the cause for the United States. On the briefs were *Solicitor General Griswold, Acting Assistant Attorney General Petersen, Allan A. Tuttle,* and *Beatrice Rosenberg.*

Briefs of *amici curiae* urging reversal were filed by *J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* for the American Federation of Labor and Congress of Industrial Organizations, and by *Arthur J. Hilland* and *Plato Cacheris* for Officers of the United Mine Workers of America.

*John L. Kilcullen* filed a brief for the National Right to Work Legal Defense Foundation as *amicus curiae* urging affirmance.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Petitioners—Pipefitters Local Union No. 562 and three individual officers of the Union—were convicted by a jury in the United States District Court for the Eastern District of Missouri of conspiracy under 18 U. S. C. § 371 to violate 18 U. S. C. § 610. At the time of trial § 610 provided in relevant part:

> "It is unlawful . . . for any corporation whatever, or any labor organization to make a contribution or expenditure in connection with any election at which Presidential and Vice Presidential electors or a Senator or Representative in . . . Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices . . . .
>
> "Every corporation or labor organization which makes any contribution or expenditure in violation of this section shall be fined not more than $5,000; and every officer or director of any corporation, or officer of any labor organization, who consents to any contribution or expenditure by the corporation or labor organization, as the case may be, . . . in violation of this section, shall be fined not more than $1,000 or imprisoned not more than one year, or both; and if the violation was willful, shall be fined

not-more than $10,000 or imprisoned not more than two years, or both.

"For the purposes of this section 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exist [*sic*] for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."[1]

The indictment charged, in essence, that petitioners had conspired from 1963 to May 9, 1968, to establish and maintain a fund that (1) would receive regular and systematic payments from Local 562 members and members of other locals working under the Union's jurisdiction; (2) would have the appearance, but not the reality of being an entity separate from the Union; and (3) would conceal contributions and expenditures by the Union in connection with federal elections in violation of § 610.[2]

---

[1] Section 371, in turn, provided:

"If two or more persons conspire . . . to commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

"If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor."

[2] Omitting the overt acts charged, the indictment, filed May 9, 1968, stated in relevant part:

"The Grand Jury charges:

"1. That at all times hereinafter mentioned defendant Pipefitters Local Union No. 562, St. Louis, Missouri, (hereinafter referred to as Local 562), affiliated with the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL–CIO (hereinafter referred to as

The evidence tended to show, in addition to disbursements of about $150,000 by the fund to candidates in federal elections, an identity between the fund and the

the United Association), was a labor organization within the meaning of Section 610 of Title 18, United States Code, that is to say, an organization in which employees participated and which existed, in part, for the purpose of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

.    .    .    .    .

"3. That from on or about October 12, 1966, up to and including the date of the filing of this indictment, defendant Lawrence L. Callanan was an officer of defendant Local 562.

"4. That at all times hereinafter mentioned defendant John L. Lawler was an officer of defendant Local 562.

"5. That at all times hereinafter mentioned, defendant George Seaton was an officer of defendant Local 562.

.    .    .    .    .

"7. That at all times hereinafter mentioned, the Pipefitters Voluntary, Political, Educational, Legislative, Charity and Defense Fund (hereinafter the Fund), was a fund of defendant Local 562, established, maintained, and administered by officers, employees, members, agents, foremen and job stewards of defendant Local 562, to effect a regular and systematic collection, receipt, and expenditure of moneys obtained from working members of defendant Local 562 and from working members of other labor organizations employed under the jurisdiction of defendant Local 562.

.    .    .    .    .

"9. That from in or about 1963 and continuously thereafter up to and including the date of the filing of this indictment, in the City of St. Louis, in the Eastern District of Missouri and elsewhere, Local 562, Lawrence L. Callanan, John L. Lawler and George Seaton, the defendants herein, and John F. Burke and Edward J. Steska, named herein as co-conspirators but not as defendants, unlawfully, wilfully and knowingly did conspire and agree with each other and with divers other persons to the grand jurors unknown, to violate Section 610 of Title 18, United States Code in that they did unlawfully, wilfully, and knowingly conspire and agree to have Local 562 make contributions and expenditures in connection with elections at which Presidential and Vice Presidential electors or United States Senators and Representatives to

Union and a collection of well over $1 million in contributions to the fund by a method similar to that employed in the collection of dues or assessments. In par-

---

Congress were to be voted for, and to wilfully consent to the making of such contributions and expenditures by Local 562.

"10. It was a part of said conspiracy that the defendants and co-conspirators would establish and maintain a special fund entitled 'Pipefitters Voluntary Political, Educational, Legislative, Charity and Defense Fund,' which fund would have the appearance of being a wholly independent entity, separate and apart from Local 562; and that the defendants and co-conspirators would thereby conceal the fact that Local 562 would make contributions and expenditures in connection with elections at which Presidential and Vice Presidential electors or United States Senators and Representatives to Congress were to be voted for.

"11. It was further a part of the conspiracy that defendant John L. Lawler would be Director of the Fund and that at a certain time he would be succeeded as Director of the Fund by defendant Lawrence L. Callanan; and that the Director of the Fund would appear to have control and management of the Fund, including the receipt and disbursement of money and the keeping of its books.

"12. It was further a part of the conspiracy that defendants John L. Lawler and Lawrence L. Callanan would not have the books of the Fund audited, or afford members of defendant Local 562 and other pipefitters contributing to the Fund any accounting for the money on hand, paid into or disbursed from the Fund.

"13. It was further a part of the conspiracy that the defendants and co-conspirators, by means of the creation and operation of the Fund, would continue in new form the practice of collecting for political purposes One Dollar ($1.00) per day worked from members of defendant Local 562 and Two Dollars ($2.00) per day worked from non-member pipefitters employed on jobs within the jurisdiction of defendant Local 562.

"14. It was further a part of the conspiracy that the defendants and co-conspirators would waive and fail to enforce Section 180 of the Constitution of the United Association in order to facilitate the payment of monies into the Fund, by failing to collect from non-members of Local 562, working under its jurisdiction, a required travel card fee of not in excess of Eight Dollars ($8.00) per month, and in lieu thereof, collecting payments to the Fund at

ticular, it was established that from 1949 through 1962 the Union maintained a political fund to which Union members and others working under the Union's jurisdiction were in fact required to contribute and that the fund was then succeeded in 1963 by the present fund, which was, in form, set up as a separate "voluntary" organization. Yet, a principal Union officer assumed the

---

the rate of Two Dollars ($2.00) per eight-hour working day from such non-members.

"15. It was further a part of the conspiracy that the defendants and co-conspirators would cause general foremen, area foremen, job stewards, officers, agents, employees and other members of Local 562 acting in a supervisory capacity over members and pipefitters working on jobs under the jurisdiction of Local 562, to become agents of the Fund in order to facilitate the collection of monies for the Fund on a regular basis on job sites and at the headquarters of Local 562, 1242 Pierce Avenue, St. Louis, Missouri.

"16. It was further a part of the conspiracy that the defendants and co-conspirators, in order to facilitate an orderly, regular and systematic collection of contributions to the Fund, would cause the agents of the Fund, referred to in paragraph 15 of this Indictment to distribute to the pipefitters working at all job sites contribution agreement cards to be signed by such pipefitters, and to distribute to foremen and job stewards at such job sites printed collection sheets for the Fund upon which to record the number of hours worked by such pipefitters and the amount of the contributions paid by each into the Fund; and that such foremen or job stewards would advise newly employed pipefitters at such job sites of the existence of the Fund and of the rates of participation, that is, for members of Local 562, One Dollar ($1.00) per eight hours worked; and after January 1, 1965, Fifty Cents ($.50) per eight hours worked, and for members of other pipefitter locals Two Dollars ($2.00) per eight hours worked.

"17. It was further a part of the conspiracy that defendant Local 562 would make substantial contributions in connection with the 1964 General Election and the 1966 General Election and that defendants Lawrence L. Callanan and John L. Lawler would consent to such contributions by issuing checks drawn upon the account of the Fund in the approximate total amount of One Hundred Fifty Thousand Dollars ($150,000)."

role of director of the present fund with full and unlimited control over its disbursements. The Union's business manager, petitioner Lawler, became the first director of the fund and was later succeeded by petitioner Callanan, whom one Local 562 member described as "the Union" in explaining his influence within the local. Moreover, no significant change was made in the regular and systematic method of collection of contributions at a prescribed rate based on hours worked, and Union agents continued to collect donations at jobsites on Union time. In addition, changes in the rate of contributions were tied to changes in the rate of members' assessments. In 1966, for example, when assessments were increased from $2\frac{1}{2}\%$ to $3\frac{3}{4}\%$ of gross wages, the contribution rate was decreased from $1 to 50¢ per day worked, with the result that the change did not cause, in the words of the Union's executive board, "one extra penny cost to members of Local Union 562." At the same time, the contribution rate for nonmembers, who were not required to pay the prescribed travel card fee for working under Local 562's jurisdiction, remained the same at $2 per day worked, approximately matching the total assessment and contribution of members. Finally, in addition to political contributions, the fund used its monies for nonpolitical purposes, such as aid to financially distressed members on strike, and for a period of a few months, upon the vote of its members, even suspended collections in favor of contributions to a separate gift fund for petitioner Callanan.[3] Not surprisingly, various witnesses testified that

---

[3] These facts petitioners, in essence, concede:

"It was undisputed that contributions to the Fund were routinely made at regular intervals at job sites; that they were routinely collected by union stewards, foremen, area foremen, general foremen, or other agents of the union; that they were determined by a formula based upon the amount of hours or overtime hours

during the indictment period contributions to the fund were often still referred to as—and actually understood by some to be—assessments, or that they paid their contributions "voluntarily" in the same sense that they paid their dues or other financial obligations.[4]

On the other hand, the evidence also indicated that the political contributions by the fund were made from accounts strictly segregated from Union dues and assessments[5] and that donations to the fund were not, in fact,

worked upon a job under the jurisdiction of the union; that they were at one rate for 562 members and at a different rate for members of other unions; that they began, continued and terminated with employment on a job under the jurisdiction of the union; that monies of the Fund were used to provide benefits to union members [as well as to make political contributions]; that non-members were not charged any dues and assessments, including travel card dues in the amount of eight dollars per month; that monies of the Fund were used in part to promote activities permitted to the union by its Constitution and by-laws; that contributions to the Fund were only requested and received from Journeyman Pipefitters working on jobs under the jurisdiction of Local 562, and not from any other classes of persons or organizations; that expenditures from the Fund were under the control of its director who was also the principal officer of the union; and that records used in the collection of the contributions to the Fund were similar to those employed from time to time by the union in the collection of its regular dues and assessments." Brief for Petitioners 52–53.

[4] See App. 197, 212; 270, 281–283; 294; 318, 323–324; 427, 432; 457, 462; 619–621; 698–699; 746; 843; 893; 903. Judge Van Oosterhout's panel opinion, adopted by the majority in the rehearing *en banc* below, 434 F. 2d 1127 (1970), succinctly makes the point: "It would appear to be unrealistic to believe that such a large number of workmen would make such substantial voluntary contributions to be used for political purposes unless they felt that their job security required them so to do." 434 F. 2d 1116, 1122 (1970).

[5] It also appears that the costs of administration of the fund, including the solicitation of contributions, were to some extent, though by no means entirely, similarly financed. See, *e. g.*, App. 17 (indictment apparently charging fund disbursements to pay for authorization cards, see n. 6, *infra,* and collection sheets); 95–96, 99,

necessary for employment or Union membership. The fund generally required contributors to sign authorization cards, which contained a statement that their donations were "voluntary . . . [and] no part of the dues or financial obligations of Local Union No. 562 . . . ,"[6] and the testimony was overwhelming from both those who contributed and those who did not, as well as from the collectors of contributions, that no specific pressure was exerted, and no reprisals were taken, to obtain donations.[7]

---

513 (one-time fund employee continuing to assist in fund bookkeeping activities in evenings and on Saturdays while on Union welfare fund payroll); 107–111 (another employee assisting in fund bookkeeping and collection activities while on Union welfare fund payroll before becoming full-time fund employee); 154 *passim* (Union agent collecting contributions on Union time); 787 (Callanan never on Union and fund payrolls at same time).

[6] The authorization card read, Brief for Petitioners 21–22:

"VOLUNTARY CONTRIBUTION AGREEMENT

"I, the undersigned, of my own free will and accord, desire to make regular contributions to the Political, Education, Legislative, Charity and Defense Fund which has been established and will be maintained by persons who are members of Local Union No. 562.

"I, therefore, agree to hereafter contribute ..% per 8 hour day to said fund and authorize my contributions to be used and expended by those in charge of the fund, in their sole judgment and discretion, for political, educational, legislative, charity and defense purposes.

"I understand that contributions are voluntary on my part and that I may revoke this agreement by a written notice to that effect mailed to the fund or to persons in charge thereof. I also understand that my contributions are no part of the dues or financial obligations of Local Union No. 562 and that the Union has nothing whatsoever to do with this fund.

"Signed ........................
"Date: ........................

"Witness: ......................."

[7] See App. 171–172; 189–190; 239–240, 244–245; 256, 259–260; 299, 311; 322–323; 347; 359–361, 363–365; 382–384; 404, 411; 446; 460; 481–483; 529; 541, 543; 554–555; 561–562; 566, 570–571; 572–573; 577–578; 581; 584–585; 593–594; 600–602, 606; 617; 633–634; 641; 653; 659; 663; 669; 685, 689; 694; 700–702; 705; 710; 715; 718;

Significantly, the Union's attorney who had advised on the organization of the fund testified on cross-examination that his advice had been that payments to the fund could not be made a condition of employment or Local 562 membership, but it was immaterial whether contributions appeared compulsory to those solicited.[8]

Under instructions to determine whether on this evidence the fund was in reality a Union fund or the con-

---

723; 731; 752–753; 766; 835; 840; 845–847; 850; 854; 858; 860; 865–866; 869, 871; 872; 875; 877; 887; 889; 894; 902; 915; 919; 925; 930; 944, 947; 948; 953; 956; 962. The only contrary evidence was the testimony of William Copeland, *id.*, at 194–213, a non-562 member who was laid off from a job two days after refusing to contribute when the Union steward explained that everyone had to pay. A co-worker, however, who was also a non-562 member, but paid his contributions, was discharged at the same time, and although he was shortly thereafter put on another 562 job, Copeland did not return to the Union hiring hall for further work. Moreover, Copeland acknowledged on cross-examination that he had "strong feelings" against Local 562, not only because of the political fund, but because of an earlier dismissal at another job involving a jurisdictional dispute between 562 and his own union.

[8] The cross-examination was as follows, *id.*, at 1067–1068:

"Q. Was it of any concern to you as to what the members who were being solicited thought about it, the atmosphere in which the solicitation was made, was that of any concern to you?

"A. None, because it made no difference as a matter of law and as a matter of procedure. I would have no way of knowing what assumptions people reach. I have no way of knowing what people think. My concern is what was said, what was done, and how it was done.

"Q. Well, in your opinion to [the organizers of the fund] did you not make it clear that in no way should it appear compulsory to the members who were asked to contribute?

"A. No, sir, I did no such thing. I simply told them that the contributions must not be made a condition of employment or a condition of Union membership and that was the extent of my advice to them on what they must do, what they must not do, and how they should do it."

tributors' fund,[9] the jury found each defendant guilty. The jury also found specially that a willful violation of § 610 was not contemplated, and the trial court im-

---

[9] The court's instructions in this regard were as follows (emphasis added):

"You will note that Section 610 prohibits contributions by labor organizations for use in connection with an election for a federal office. It does not prohibit any person from making or agreeing to make such contributions or setting up an independent fund for such purpose separate and distinct from union funds either alone or in conjunction with others, simply because such person happens to be a member of a labor organization. That is, the statute is not violated unless the contribution is in fact and in the final analysis made by the labor organization.

"In this case evidence was offered by the Government to the effect that funds were contributed to or on behalf of candidates for federal office and that such funds were paid out upon checks drawn upon the Pipefitters Voluntary Political, Educational, Legislative, Charity and Defense Fund. *It is necessary, therefore, that the evidence establish that the Pipefitters . . . Fund was in fact a union fund, that the money therein was union money, and that the real contributor to the candidates was the union. As to this issue, the defendants contend that the fund in question was a bona fide entity separate and apart from the union, established by the voluntary good faith act of members of the pipefitters Local 562 and others, from which contributions to candidates were made on behalf of the persons who created the fund and not on behalf of the union. On the other hand, the Government contends that the fund was a mere artifice or device set up by the defendants and others as a part of the alleged conspiracy to give the outward appearance of being an independent and separate entity but in fact constituting a part of union funds.*

"In determining whether the Pipefitters Voluntary Fund was a bona fide fund, separate and distinct from the union or a mere artifice or device, you should take into consideration all the facts and circumstances in evidence, and in such consideration you may consider

"1. Whether or not payments to the fund were routinely made at regular intervals at job sites,

"2. Whether or not payments to the fund were routinely col-

posed sentence accordingly. The Union was fined $5,000, while the individual defendants were each sentenced to one year's imprisonment and fined $1,000.

---

lected by union stewards, foremen, area foremen, general foremen, or other agents of the union,

"3. Whether or not the payment to the fund was determined by a formula based upon the amount of hours or overtime hours worked upon a job under the supervision of the union,

"4. Whether or not payments to the fund were at one rate for 562 members and at a different rate for members of other unions,

"5. Whether or not payments to the fund began, continued and terminated with employment on a job under the jurisdiction of the union,

"6. Whether or not monies of the fund were used to provide benefits to union members in their capacity as members,

"7. Whether or not payments to the fund by members of other unions were in lieu of payments to the union in the form of travel card dues in the amount of eight dollars per month,

"8. Whether or not monies of the fund were used in part to promote activities properly permitted to the union pursuant to Section 2.05 of its Constitution and by-laws,

"9. Whether or not payments to the fund were made by those affiliated with the union to the general exclusion of other classes of persons or organizations,

"10. Whether or not contributions to the fund were required as a condition of employment or continued employment or membership in Local 562,

"11. Whether or not the individuals who contributed to said fund signed a voluntary contribution agreement,

"12. Whether or not the contributions to said fund were made voluntarily or involuntarily,

"13. Whether or not the monies contributed to said fund were kept separate and distinct from the funds of Local 562,

"14. Whether or not some persons who worked under the jurisdiction of Local 562 did not contribute to said fund,

"15. Whether or not the monies of said fund were used in part to promote activities which were prohibited to Local 562 by its Constitution and by-laws,

"16. Whether or not said fund was established and maintained pursuant to the advice of counsel,

"17. Whether or not the monies of said fund were reported to

On appeal to the Court of Appeals for the Eighth Circuit, petitioners contended that the indictment failed to allege, and the evidence was insufficient to sustain, a conspiracy to violate § 610, and that § 610, on its face or as construed and applied, abridged their rights under the First, Fifth, Sixth, and Seventeenth Amendments and Art. I, § 2, of the Constitution. They argued further that the special finding by the jury that a willful violation of § 610 was not contemplated effectively resulted in acquittal, since such willfulness was an essential element of the conspiracy under 18 U. S. C. § 371. The Court of Appeals in a four-to-three *en banc* decision, 434

---

the Department of Labor on the LM–2 forms, which required the reporting of monies of Local 562,

"18. Whether or not expenditures from the fund were under the control of the union and its officers,

"19. Whether or not records used in the collection of the payments to the fund are similar to those employed from time to time by the union in the collection of its regular dues and assessments.

"If upon consideration of all the facts and circumstances in evidence you find that the contributions to the candidates for federal office for political purposes were in fact made out of union funds by the union, and that the individual defendants as officers of the union, willfully consented thereto, then you may take this fact into consideration together with other facts in evidence in determining whether there was a prior understanding or agreement so to do.

"A great deal of evidence has been introduced on the question of whether the payments into the Pipefitters Voluntary Political, Educational, Legislative, Charity and Defense Fund by members of Local 562 and others working under its jurisdiction were voluntary or involuntary. This evidence is relevant for your consideration, along with all other facts and circumstances in evidence, in determining whether the fund is a union fund. However, the mere fact that the payments into the fund may have been made voluntarily by some or even all of the contributors thereto does not, of itself, mean that the money so paid into the fund was not union money."

F. 2d 1127 (1970), adopted Judge Van Oosterhout's panel opinion rejecting each of these claims, 434 F. 2d 1116 (1970). The gist of the court's decision, insofar as pertinent here, was that the Pipefitters fund was a subterfuge through which the Union made political contributions of Union monies in violation of § 610, as demonstrated by the evidence that the fund regularly served Union purposes and that the donors to the fund contributed in the belief that their job security depended upon it. We granted certiorari. 402 U. S. 994 (1971).

After we heard oral argument, the President on February 7, 1972, signed into law the Federal Election Campaign Act of 1971, which in § 205 amends 18 U. S. C. § 610, see *infra*, at 409–410, effective April 7, 1972. See Federal Election Campaign Act of 1971, § 406, 86 Stat. 20. We, accordingly, requested the parties to file supplemental briefs addressing the impact of that amendment on this prosecution.[10] Having considered those briefs, we now hold that § 205 of the Federal Election Campaign Act merely codifies prior law, with one possible exception pertinent to this case; that the change in the law, if in fact made, does not in any event require this prosecution to abate; but that the judgment below must, nevertheless, be re-

---

[10] The questions posed to the parties were:

"Does § 205 of the Federal Election Campaign Act of 1971 [P. L. 92–225] affect the decision in this case, and, if so, with what result? More particularly, does § 205 effect a substantive change in 18 U. S. C. § 610 in any way material to this case, as, for example, by altering any of the attributes of permissible union political organizations, such as the method of organization or administration or the method of solicitation or collection of contributions? If so, must this prosecution abate under the doctrine of *United States* v. *The Schooner Peggy,* 1 Cranch 103, and its progeny? Or does the federal saving statute, 1 U. S. C. § 109, nullify any abatement of the prosecution? In answering the latter question, what effect should be given to *Hamm* v. *Rock Hill,* 379 U. S. 306?"

versed because of erroneous jury instructions.[11] This disposition makes decision of the constitutional issues premature, and we therefore do not decide them. Cf.

[11] Petitioners Callanan and Lawler died pending our decision. The judgment affirming the convictions of those petitioners will therefore be vacated with directions to the District Court to dismiss the indictment against them. *Durham* v. *United States,* 401 U. S. 481 (1971). The remaining petitioners press the argument, rejected by the Court of Appeals, that the special finding by the jury that a willful violation of § 610 was not contemplated amounted to an acquittal, since such willfulness was an essential element of the conspiracy under 18 U. S. C. § 371. The trial court apparently required a special finding to determine whether the substantive offense that petitioners were charged with conspiring to commit was a misdemeanor or a felony. See 18 U. S. C. § 610. That, in turn, was relevant for imposing sentence under § 371. See n. 1, *supra.* Petitioners contend that § 371 punishes a conspiracy to commit a *malum prohibitum* such as § 610 only when the object of the conspiracy is known to have been unlawful, which, so the argument goes, the jury found not to have been the case here by virtue of its special finding. This argument is not persuasive. Petitioners not only failed to object to the trial court's requirement that the jury return a special finding as inconsistent with the general charge, but also failed to move for acquittal on the ground now offered once the special finding was returned. More important, even assuming, *arguendo,* the correctness of petitioners' premise that knowledge of the reach of § 610 was a requisite for conviction, but see *Keegan* v. *United States,* 325 U. S. 478, 506 (1945) (Stone, C. J., dissenting); see generally Developments in the Law—Criminal Conspiracy, 72 Harv. L. Rev. 920, 936–937 (1959), petitioners would still be entitled at best to a new trial, not acquittal. The trial court specifically instructed the jury:

"The crime charged in this case requires proof of specific intent before a defendant can be convicted. . . . *To establish specific intent the Government must prove that the defendant knowingly, willfully and purposely did an act which the law forbids.* . . .

"An act is done 'knowingly' if done voluntarily and with knowledge of the facts, and not because of mistake or inadvertence or other innocent reason.

"*An act is done 'willfully' if done voluntarily and purposely and*

*United States* v. *Auto Workers,* 352 U. S. 567 (1957);
*United States* v. *CIO,* 335 U. S. 106 (1948).

## I

We begin with an analysis of § 610.

*First.* The parties are in agreement that § 610, despite its broad language, does not prohibit a labor organization from making, through the medium of a political fund organized by it, contributions or expenditures in connection with federal elections, so long as the monies expended are in some sense volunteered by those asked to contribute. Thus, the Government states in its brief, "Nor do we dispute [petitioners'] conclusion, following their review of the legislative history of Section 610, that a union could 'establish a political organization for the purpose of receiving ear-marked political monies directly from [voluntary contributions of] union members . . . .'" Brief for the United States 27 n. 7, quoting Brief for Petitioners 62. See also Brief for the United States 30. This construction of § 610 is clearly correct.[12]

*with the specific intent to do that which the law forbids; that is to say, with bad purpose either to disobey or to disregard the law.*

"An act is done 'unlawfully' if done contrary to law." App. 1110 (emphasis added). See also *id.,* at 1116 (instruction on good-faith belief in legality of object of conspiracy).

In view of this instruction the jury's special finding may well have been inconsistent with its general verdict, but that, we hold, could require only reversal, not acquittal.

[12] The dissent declines to accept this agreement of the parties on the ground that the language of § 610 is so clear on its face that there is no warrant for turning to the legislative history of the provision. The contrary is plainly true: Section 610 wholly fails to specify what funds a labor organization is barred from contributing or expending in connection with a federal election. Moreover, as we shall shortly see, the dissent's "facial" interpretation of § 610 was expressly rejected by its proponents in 1947, both from concern that it would raise constitutional questions of invasion of First Amendment freedoms, and in an effort to ensure enactment of the

The antecedents of § 610 have previously been traced in United States v. Auto Workers and United States v. CIO, both supra. We need recall here only that the prohibition in § 313 of the Federal Corrupt Practices Act of 1925, 43 Stat. 1074, on contributions by corporations in connection with federal elections was extended to labor organizations in the War Labor Disputes Act of 1943, 57 Stat. 163, but only for the duration of the war. As the Court noted in CIO, supra, at 115, "It was felt that the influence which labor unions exercised over elections through monetary expenditures should be minimized, and that it was unfair to individual union members to permit the union leadership to make contributions from general union funds to a political party which the individual member might oppose." The prohibition on contributions was then permanently enacted into law in § 304 of the Labor Management Relations Act, 1947, 61 Stat. 159, with the addition, however, of a proscription on "expenditures" and an extension of both prohibitions to payments in connection with federal primaries and political conventions as well as federal elections themselves. Yet, neither prohibition applied to payments by union political funds in connection with federal elections so long as the funds were financed in some sense by the

---

law. In addition, Congress has only recently in the Federal Election Campaign Act of 1971 decisively rejected that interpretation on the basis of the very legislative history found dispositive herein. See n. 20, infra. Congress in 1947 and again only a few months ago was able to come to this conclusion solely because of the facial ambiguity of the provision.

It is also worth noting that the dissent's own analysis reveals the necessity for resorting to the legislative history of the statute. The dissent, too, appreciates "the freedom of union members, as well as that of employees and stockholders of corporations, to make uncoerced political contributions." If that is so, it obviously becomes imperative to determine the contours of that freedom, which, in turn, requires investigation of the legislative history of § 610.

voluntary donations of the union membership. Union political funds had come to prominence in the 1944 and 1946 election campaigns and had been extensively studied by special committees of both the House and the Senate. Against the backdrop of the committee findings and recommendations, the Senate debates upon the reach of § 304 attached controlling significance to the voluntary source of financing of the funds. The unequivocal view of the proponents of § 304 was that the contributions and expenditures of voluntarily financed funds did not violate that provision.

The special committees investigating the 1944 and 1946 campaigns devoted particular attention to the activities of the Political Action Committee (PAC) of the Congress of Industrial Organizations (CIO) because they had stirred considerable public controversy. See H. R. Rep. No. 2093, 78th Cong., 2d Sess., 2–6 (1945); S. Rep. No. 101, 79th Cong., 1st Sess., 20–24, 57–59 (1945); H. R. Rep. No. 2739, 79th Cong., 2d Sess., 30–31 (1946). See also S. Rep. No. 1, pt. 2, 80th Cong., 1st Sess., 34 (1947). The committee findings were that PAC had been established by the executive board of the CIO in July 1943; that it consisted of a national office and 14 regional offices advising and coordinating numerous state and local political action committees; that its connection to the CIO was close at every level of organization; that its program, adopted by the CIO convention in November 1943, had included the re-election of President Roosevelt and the election of a "progressive" Congress; that it had initially been financed by sizable pledges from the treasuries of CIO international unions and that some of these funds had been expended in federal primaries; but that, following the nomination in July 1944 of President Roosevelt for re-election, it was generally financed by $1 contributions knowingly and freely made by individual CIO members; and that these monies were used for

political educational activities, including get-out-the-vote drives, but were not directly contributed to any candidate or political committee. Thus, PAC had limited its direct contributions in federal campaigns to primaries, to which the Act at the time expressly did not apply, and restricted its activities in the elections themselves to so-called "expenditures" rather than "contributions." The Senate Special Committee on Campaign Expenditures concluded in 1945 that, in these circumstances, there was "no clear-cut violation" by PAC of § 313 of the Corrupt Practices Act. S. Rep. No. 101, *supra,* at 23. Although there was agreement within the committee that § 313 should be extended to federal primaries and nominating conventions because of their importance in determining final election results, *id.,* at 81–82,[13] there was disagreement on whether § 313 should also be amended to proscribe "expenditures" in addition to "contributions." A majority believed that it should not be, in part because the amendment "would tend to limit the rights of freedom of speech, freedom of the press, and freedom of assembly as guaranteed by the Federal Constitution." *Id.,* at 83.[14] Senators Ball and Ferguson, who dissented from this conclusion, nevertheless conceded that even as to "expenditures" "[i]f the Political Action Committee had been organized on a voluntary basis and obtained its funds from voluntary individual contributions from the beginning, there could be no quarrel with its activities or program and in fact both are desirable in a democracy." *Id.,* at 24. The

---

[13] See also H. R. Rep. No. 2093, 78th Cong., 2d Sess., 9 (1945); S. Rep. No. 1, pt. 2, 80th Cong., 1st Sess., 36 (1947). But see H. R. Rep. No. 2739, 79th Cong., 2d Sess., 46–47 (1946).

[14] The Senate committee did recommend that the use of general union funds to finance the distribution of a political pamphlet in connection with a federal election be prosecuted as a test case to determine the scope of the term "contribution" in § 313. S. Rep. No. 101, 79th Cong., 1st Sess., 57–59 (1945).

House Campaign Expenditures Committee in 1946, however, strongly urged the adoption of a prohibition on "expenditures" in terms condemning the activities of PAC without regard to the source of its funds.[15]

Then, in 1947, Congress made permanent the application of § 313 of the Corrupt Practices Act to labor organizations and closed the loopholes that were thought to have been exploited in the 1944 and 1946 elections. These changes were embodied in § 304 of the labor bill introduced by Representative Hartley, which was adopted by the House and the conference committee with little apparent discussion or opposition.[16] The provision, how-

---

[15] H. R. Rep. No. 2739, *supra*, n. 13, at 39–40, 43, 46. The House Committee declared, for example, *id.*, at 43:

"The CIO Political Action Committee is a committee of the Congress of Industrial Organizations and, as such, under the Corrupt Practices Act, is likewise as a labor union prohibited [from] making any contribution in connection with any election at which a Representative to Congress is to be elected.

"The committee feels that whether or not the activities carried on by these organizations and the payment of salaries to men known as organizers or advisers who go into the congressional districts and actively assist in local campaign activities, and expenditures for radio time, newspaper advertising, printing and distribution of handbills and posters, and for transportation of voters, constitute violations of the letter of the Federal Corrupt Practices Act, they certainly constitute violations of the spirit and intent of the law and the [Act] should be so amended as to clearly and distinctly set out that such activities are prohibited."

The Senate committee studying the 1946 campaign joined this recommendation, but without any reference to PAC. See S. Rep. No. 1, pt. 2, *supra*, n. 13, at 38–39. See also H. R. Rep. No. 2093, *supra*, n. 13, at 9, 10–11 (noting the controversy over the scope of the term "contribution" and expressing views seemingly sympathetic with prohibiting "expenditures").

[16] See H. R. Rep. No. 245, 80th Cong., 1st Sess., 46 (1947); 93 Cong. Rec. 3428, 3522–3523 (1947); H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 67–68 (1947). See also 93 Cong. Rec. 6389 (critical remarks of Rep. Sabath following the conference com-

ever, provoked lengthy debate on the Senate floor when Senator Taft, sponsor of the Senate labor bill and one of the Senate conferees, sought to explain its import. That debate compellingly demonstrates that voluntarily financed union political funds were not believed to be prohibited by the broad wording of § 304. Thus, Senator Taft stated:

"[I]t seems to me the conditions are exactly parallel, both as to corporations and labor organizations. [An association of manufacturers] receiving corporation funds and using them in an election would violate the law, in my opinion, exactly as the PAC, if it got its fund from labor unions, would violate the law. *If the labor people should desire to set up a political organization and obtain direct contributions for it, there would be nothing unlawful in that.* If the National Association of Manufacturers, we will say, wanted to obtain individual contributions for a series of advertisements, and if it, itself, were not a corporation, then, just as in the case of PAC, it could take an active part in a political campaign." 93 Cong. Rec. 6439 (1947) (emphasis added).

In response to a question by Senator Magnuson whether unions would be prohibited from publishing a newspaper "favoring a candidate, mentioning his name, or endorsing him for public office," Taft continued:

"No; I do not think it means that. The union can issue a newspaper, and can charge the members for the newspaper, that is, the members who buy

mittee report). The only statement offering a rationale for § 304 was made by Representative Robsion after the House had voted to override President Truman's veto of the Act. Robsion stressed that it was unfair to union members to allow the expenditure of union funds in support of candidates for federal office whom they opposed. See 93 Cong. Rec. 7492.

copies of the newspaper, and the union can put such matters in the newspaper if it wants to. The union can separate the payment of dues from the payment for a newspaper if its members are willing to do so, that is, if the members are willing to subscribe to that kind of a newspaper. I presume the members would be willing to do so. A union can publish such a newspaper, *or unions can do as was done last year, organize something like the PAC, a political organization, and receive direct contributions, just so long as members of the union know what they are contributing to, and the dues which they pay into the union treasury are not used for such purpose."* *Id.,* at 6440 (emphasis added).

When Magnuson rejoined that "all union members know that a part of their dues in these cases go for the publication of some labor [newspaper] organ," Taft concluded:

"Yes. How fair is it? We will assume that 60 percent of a union's employees are for a Republican candidate and 40 percent are for a Democratic candidate. Does the Senator think the union members should be forced to contribute, without being asked to do so specifically, and without having a right to withdraw their payments, to the election of someone whom they do not favor? Assume the paper favors a Democratic candidate whom they oppose or a Republican candidate whom they oppose. Why should they be forced to contribute money for the election of someone to whose election they are opposed? *If they are asked to contribute directly to the support of a newspaper or to the support of a labor political organization, they know what their money is to be used for and presumably approve it. From such contribution the organization can spend all the money it wants to with respect to such*

*matters.   But the prohibition is against labor unions
using their members' dues for political purposes,*
which is exactly the same as the prohibition against
a corporation using its stockholders' money for po-
litical purposes, and perhaps in violation of the
wishes of many of its stockholders." *Ibid.* (empha-
sis adJled).

See also *id.,* at 6437, 6438.

Senator Taft's view that a union cannot violate the law
by spending political funds volunteered by its members
was consistent with the legislative history of the War
Labor Disputes Act and an express interpretation given
to that Act by the Attorney General in 1944.[17]   His

---

[17] See Hearings on H. R. 804 and H. R. 1483, before a Subcommit-
tee of the House Committee on Labor, 78th Cong., 1st Sess.,
117, 133 (1943) (statements of Rep. Landis; sponsor of the meas-
ure) ("Individual union members would not be prohibited from
contributing." "If you have a membership of 500,000, and all the
Democrats wanted to give a dollar apiece, and there were 300,000,
that would be $300,000. . . . Your whole organization could give
as high as that if they donated only a dollar apiece"); letter from
Attorney General Biddle to Sen. E. H. Moore (Sept. 23, 1944)
(emphasis added), reproduced in Department of Justice Press Re-
lease, Sept. 25, 1944, and noted in 4 Law. Guild Rev., No. 5, p. 49
(1944):

"You also point out [the Attorney General wrote] that commit-
tees composed of members of unions are engaged in the solici-
tation of funds from individual union members and you assert
that committees of this kind 'are as much a labor organization
as a union organization itself.' This contention is inconsistent
with the provisions of the statute. In amending section 313 of
the Corrupt Practices Act, the [War Labor Disputes Act] pro-
vided that for the purposes of the amendment the words 'labor
organization' should have the same meaning they have under
the National Labor Relations Act. . . . I think it clear that com-
mittees of the kind that you describe are not labor organizations
within the meaning of this definition and they would not be recog-
nized as bargaining agencies by the National Labor Relations Board.
*Even if it were true that these committees were identical with the*

view also reflected concern that a broader application of § 610 might raise constitutional questions of invasion of First Amendment freedoms, and he wished particularly to reassure colleagues who had reservations on that score and whose votes were necessary to override a predictable presidential veto, see 93 Cong. Rec. 7485, of the Labor Management Relations Act.[18]  We conclude, accordingly, that his view of the limited reach of § 610, entitled in any event to great weight, is in this instance controlling.  Cf. *Newspaper Pub. Assn.* v. *NLRB,* 345 U. S. 100, 106–111 (1953); *Bus Employees* v. *Wisconsin Board,* 340 U. S. 383, 392 n. 15 (1951).  We therefore hold that § 610 does not apply to union contributions and expenditures from political funds financed in some sense by the voluntary donations of employees.  Cf. *United States* v. *Auto Workers,* 352 U. S., at 592; *United States* v. *CIO,* 335 U. S., at 123.

Section 205 of the Federal Election Campaign Act confirms this conclusion by adding at the end of § 610 the following paragraph:

> "*As used in this section, the phrase 'contribution or expenditure'* shall include any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value (except a loan of money by a national or State bank

---

labor organizations to which their members belong—which I believe not to be the fact—there would still be no violation of law because the statute applies to contributions made by labor organizations and in this case the contributions are made by individuals and not by the committees."

[18] See, *e. g.,* 93 Cong. Rec. 6448, 6522–6523 (exchange between Sen. Pepper, who, in opposing § 304, decried it as Republican legislation in contravention of the First Amendment, and Sen. Ellender, who, as a Democratic representative on the conference committee, rose in support of Sen. Taft's construction). See also *United States* v. *CIO,* 335 U. S. 106, 120 (1948).

made in accordance with the applicable banking laws
and regulations and in the ordinary course of busi-
ness) to any candidate, campaign committee, or po-
litical party or organization, in connection with any
election to any of the offices referred to in this sec-
tion; but *shall not include* communications by a
corporation to its stockholders and their families or
by a labor organization to its members and their
families on any subject; nonpartisan registration and
get-out-the-vote campaigns by a corporation aimed
at its stockholders and their families, or by a labor
organization aimed at its members and their families;
*the establishment, administration, and solicitation of
contributions to a separate segregated fund to be
utilized for political purposes by a corporation or
labor organization: Provided, That it shall be un-
lawful for such a fund to make a contribution or
expenditure by utilizing money or anything of value
secured by physical force, job discrimination, finan-
cial reprisals, or the threat of force, job discrimina-
tion, or financial reprisal; or by dues, fees, or other
monies required as a condition of membership in a
labor organization or as a condition of employment,*
or by monies obtained in any commercial transac-
tion." 86 Stat. 10 (emphasis added).

This amendment stemmed from a proposal offered by
Representative Hansen on the House floor, see 117 Cong.
Rec. 43379, to which the Senate acquiesced in con-
ference. See *id.,* at 46799 (joint conference com-
mittee report). Hansen stated that the purpose of his
proposal was, with one exception not pertinent here,[19] "to
codify the court decisions interpreting [and the legislative
history explicating] section 610 . . . and to spell out in

---

[19] The exception involved whether nonpartisan registration and
get-out-the-vote campaigns could be directed to the public at large.
See 117 Cong. Rec. 43379–43381, 43390.

more detail what a labor union or corporation can or cannot do in connection with a Federal election." [20] Moreover, there was substantial agreement among his colleagues that the effect of his amendment was, in fact, mere codification and clarification,[21] and even those who disagreed did not dispute that voluntarily financed union political funds are permissible. Indeed, Representative Crane, who led the opposition to the Hansen amendment,[22] himself had written the House committee provision for which the Hansen amendment was, in effect, substituted.[23] Mr. Crane's provision, like the Hansen amendment, was said in some measure to codify existing law,[24] and would also have specifically authorized voluntary funds.[25] This consensus that has now been captured in

---

[20] *Id.*, at 43379. See also 118 Cong. Rec. 329. In determining that § 610 has always permitted unions to organize voluntarily financed political funds, Hansen relied, as we have done, on Sen. Taft's floor explanation of § 304 of the Hartley bill. See 117 Cong. Rec. 43381; 118 Cong. Rec. 329.

[21] See, *e. g.*, 117 Cong. Rec. 43381 (remarks of Rep. Hays), 43383–43385 (remarks of Rep. Thompson), 43388–43389 (remarks of Reps. Steiger and Gude).

[22] See, *e. g.*, 117 Cong. Rec. 43382, 43386, 43390–43391; 118 Cong. Rec. 323–324.

[23] The Hansen proposal was offered as an amendment to an amendment in the nature of a substitute to the bill as reported out of committee. Although the substitute amendment had no provision relating to § 610, see 117 Cong. Rec. 43365–43366, it was expected that the Crane provision would be taken up as an amendment to the substitute amendment if the Hansen amendment failed to carry. See, *e. g.*, *id.*, at 43389–43390 (remarks of Reps. Devine and Crane). [REPORTER'S NOTE: The remarks of Rep. Devine, whose name was erroneously omitted from 117 Cong. Rec. 43389, col. 3, par. 5, line 1, begin with the language, "Mr. Chairman, I rise in opposition . . . ."]

[24] See, *e. g.*, *id.*, at 43389–43390 (remarks of Rep. Devine).

[25] The Crane provision would have added the following paragraph at the end of § 610:

"As used in this section, the phrase 'contribution or expenditure' shall include any direct or indirect payment, distribution, loan, ad-

express terms in § 610 cannot, of course, by itself conclusively establish what Congress had in mind in 1947. But it does " 'throw a cross light' " on the earlier enactment that, together with the latter's legislative history, demonstrates beyond doubt the correctness of the parties' common ground of interpretation of § 610. *Michigan Nat. Bank* v. *Michigan*, 365 U. S. 467, 481 (1961) (quoting L. Hand, J.). Cf. *NLRB* v. *Allis-Chalmers Mfg. Co.*,

---

vance, deposit, or gift, of money, or any services, or anything of value to any candidate, compaign [*sic*] committee, or political party or organization, in connection with any election to any of the offices referred to in this section, including any expenditure in connection with get-out-the-vote activities. *Nothing in this section shall preclude an organization from establishing and administering a separate contributory fund for any political purpose, including voter registration or get-out-the-vote drives, if all contributions, gifts, or payments to such fund are made freely and voluntarily, and are unrelated to dues, fees, or other moneys required as a condition of membership in such organization or as a condition of employment.*" H. R. Rep. No. 92–564, p. 19 (1971) (emphasis different).

The principal bone of contention between the proponents and opponents of the Hansen amendment when it was first introduced was whether union or corporation treasuries could and should be available to finance get-out-the-vote drives. Representative Frenzel, for example, summarized the debate shortly oefore the House vote on the Hansen amendment was taken, 117 Cong. Rec. 43391:

"[I]t is important that we understand neither the Crane amendment nor the Hansen amendment is directed toward voluntary or COPE [the successor of PAC] moneys. What we are talking about is Treasury money. The principal distinction is that the Hansen amendment would allow its use to get-out-the-vote drives for union members while the Crane amendment would not."

Following the conference committee report, Crane rose once again in opposition to the Hansen amendment, this time and for the first time criticizing the amendment in its treatment of union political funds. The dispute centered then, however, not on whether voluntary funds were permissible, but on exactly what their prerequisites were. See *infra*, at 422–426.

388 U. S. 175, 194 (1967); *NLRB* v. *Drivers Local Union,* 362 U. S. 274, 291–292 (1960).

*Second.* Where the litigants part company is in defining precisely when political contributions and expenditures by a union political fund fall outside the ambit of § 610. The Government maintains, first, that a valid fund may not be the alter ego of the sponsoring union in the sense of being dominated by it and serving its purposes, regardless of the fund's source of financing:

> "Section 610 was violated [the Government explains] if in fact the [Pipefitters] Fund was merely a subterfuge through which the union itself made proscribed political contributions, irrespective of whether the moneys so contributed were voluntarily given to the Fund by the contributors. . . . [T]he evidence that the payments were voluntary [was only a factor relevant] in determining if it was the union or the Fund as a separate entity that made the political contributions in question . . . ." Brief for the United States in Opposition to the Petition for Certiorari 7.

See also Brief for the United States 24. The requirement that the fund be separate from the sponsoring union eliminates, in the Government's view, "the corroding effect of money employed in elections by aggregated powers," *United States* v. *Auto Workers,* 352 U. S., at 582, which this Court has found to be one of the dual purposes underlying § 610. See *id., passim; United States* v. *CIO,* 335 U. S., at 113, 115. The Government urges, secondly, that in accordance with the legislative intent to protect minority interests from overbearing union leadership, which we have found to be the other purpose of § 610, see *ibid.,* the fund may not be financed by monies actually required for employment or union membership *or* by payments that

are effectively assessed, that is, solicited in circumstances inherently coercive.[26] Petitioners, on the other hand, contend that, to be valid, a political fund need not be distinct from the sponsoring union and, further, that § 610 permits the union to exercise institutional pressure, much as recognized charities do, in soliciting donations. See Brief for Petitioners 71, 73 n. 22.

We think that neither side fully and accurately portrays the attributes of legitimate political funds. We hold that such a fund must be separate from the sponsoring union only in the sense that there must be a strict segregation of its monies from union dues and assessments.[27] We hold, too, that, although solicitation by union officials is permissible, such solicitation must be conducted under circumstances plainly indicating that donations are for a political purpose and that those solicited may decline to contribute without loss of job, union membership, or any other reprisal within the union's institutional power. Thus, we agree with the second half of the Government's position, but reject the first.

As Senator Taft's remarks quoted above indicate, *supra,* at 406–408, the test of voluntariness under § 610 focuses on whether the contributions solicited for political use are knowing free-choice donations. The dominant concern in requiring that contributions be voluntary was, after all, to protect the dissenting stockholder or union

---

[26] "A union member [the Government explains] may find irresistible the union's demand—through its steward on the jobsite—for contributions fixed as a regular percentage of days worked and money earned. Section 610 reduces this institutional pressure by forbidding the unions from making direct political contributions from money that is effectively assessed." Brief for the United States 38. As we shall see, *infra,* at 435–442, the Government's theory in prosecuting this case focused on the first, but not the second, of its arguments here presented.

[27] For the scope of the required segregation of funds, see *infra,* at 428–432.

member. Whether the solicitation scheme is designed to inform the individual solicited of the political nature of the fund and his freedom to refuse support is, therefore, determinative.

Nowhere, however, has Congress required that the political organization be formally or functionally independent of union control or that union officials be barred from soliciting contributions or even precluded from determining how the monies raised will be spent. The Government's argument to the contrary in the first half of its position is based on a misunderstanding of the purposes of § 610.[28] When Congress pro-

---

[28] The Government relies on *United States* v. *Lewis Food Co.*, 366 F. 2d 710 (1966), where the Court of Appeals for the Ninth Circuit upheld an indictment under § 610 that failed to allege, *inter alia*, that an expenditure by a corporation in connection with a federal election was made against the wishes of an individual stockholder. The court there explained, *id.*, at 713–714:

"The statute itself . . . does not provide an exception when stockholders consent. We are of the opinion that Congress intended to insure against officers proceeding in such matters without obtaining the consent of shareholders by forbidding all such expenditures.

"The Supreme Court stated that the other legislative motivation [in addition to the protection of minority interests] for enactment of legislation such as section 610 was the necessity for destroying the influence over elections which corporations exercised through financial contributions. [*United States* v. *CIO*, 335 U. S., at 113.] This consideration would be meaningless if a corporation could make expenditures for activities otherwise forbidden by section 610 by simply obtaining unanimous consent of its shareholders. In the *Auto Workers* case, the indictment contained no allegation that the expenditure of union funds [to finance television broadcasts designed to influence the electorate at large] was contrary to the wish of members. Nevertheless, the Supreme Court found the indictment sufficient."

The Ninth Circuit's reliance on *Auto Workers* was misplaced. The indictment there did allege, as we noted, 352 U. S., at 584, " 'that the fund used came from the Union's dues, was not obtained by

hibited labor organizations from making contributions or expenditures in connection with federal elections, it was, of course, concerned not only to protect minority interests within the union but to eliminate the effect of aggregated wealth on federal elections. But the aggregated wealth it plainly had in mind was the general union treasury—not the funds donated by union members of their own free and knowing choice. Again, Senator Taft adamantly maintained that labor organizations were not prohibited from expending those monies in connection with federal elections. Indeed, Taft clearly espoused the union political organization merely as an alternative to permissible direct political action by the union itself through publications endorsing candidates in federal elections. The only conditions for that kind of direct electioneering were that the costs of publication be financed through individual subscriptions rather than through union dues and that the newspapers be recognized by the subscribers as political organs

voluntary political contributions or subscriptions from members of the Union, and was not paid for by advertising or sales.' " In Auto Workers, therefore, we had no-occasion to address the legitimacy of union-controlled political contributions financed from the knowing free-choice donations of union members. More important, the court in Lewis labored under the same misapprehension on which the Government's argument rests here—namely, that the legislative purpose to eliminate the effects of aggregated wealth on federal elections reaches union- or corporation-controlled contributions and expenditures financed not from the general treasury, but from voluntary donations.

By saying this, we do not mean to suggest that the result in Lewis was incorrect. To the contrary, an indictment that alleges a contribution or expenditure from the general treasury of a union or corporation in connection with a federal election states an offense. See nn. 47 and 48, infra. The unanimous vote of the union members or stockholders may at most (but we need not now decide) be a defense.

that they could refuse to purchase.[29] Neither the absence of even a formally separate organization, the solicitation of subscriptions by the union, nor the method for choosing the candidates to be supported was mentioned as being material. Similarly, the only requirements for permissible political organizations were that they be funded through separate contributions and that they be recognized by the donors as political organizations to which they could refuse support. As Taft said, "If the labor people should desire to set up a political organization and obtain direct contributions for it, there would be nothing unlawful in that," "just so long as members of the union know what they are contributing to, and the dues which they pay into the union treasury are not used for such purpose." *Supra*, at 406, 407.

The operations of PAC, the organization that dominated the congressional investigations of the 1944 and 1946 campaigns and that was expressly approved by the 80th Congress, are especially instructive in this regard. Significantly, it was exactly the knowing free-choice donation test of voluntariness that PAC sought scrupulously to observe in soliciting contributions. Sidney Hillman, Chairman of PAC, testified before the House Campaign Expenditures Committee in 1944:

> "[W]e have utilized every avenue to tell the people not to become overenthusiastic about collections. We want this contribution on a voluntary basis and would rather have no contribution than to have any

---

[29] In *United States* v. *CIO*, this Court, of course, went further than Senator Taft's comments would allow by holding that § 304 did not bar a union from using union funds to publish a periodical, in regular course and for distribution to those accustomed to receiving it, that urged union members to vote for a candidate for Congress. The Court, however, arrived at that construction because the contrary interpretation would create "the gravest doubt" of the statute's constitutionality. 335 U. S., at 121.

taint of coercion or even any interference. We do not want any money except from those who want to see the reelection of Roosevelt." [30]

PAC was, nevertheless, generally regarded, not as a functionally separate organization (except for its method of financing [31]), but as an instrumentality of the CIO, itself subsumed within the definition of "labor organization." [32]  It was, as we have seen, established by

[30] Hearings before the House Committee to Investigate Campaign Expenditures on H. Res. 551, 78th Cong., 2d Sess., 79 (1944). See also id., at 16–17. PAC's method of collection of contributions appears, in large measure, to have been true to Hillman's words, since both its political and voluntary nature were well known. See id., at 51, 76–79, 712–713, 728–729, 800–801, 822–823, 844–845, 851, 864–866, 871, 880, 885–886, 921–925, 928, 935–936, 941, 946, 962, 964, 988, 999, 1017, 1021–1031, 1033–1038, 1041. In some instances complaints were lodged that pressure had been exercised in obtaining donations, and the House Committee noted in its report that in California some PAC monies were taken directly from union treasuries and "that at least one local union . . . upon vote by its entire membership levied an assessment of 25 cents per month upon each member . . . ." H. R. Rep. No. 2093, supra, n. 13, at 6. This, nevertheless, was recognized as an exception "[to] the general national plan" following Roosevelt's nomination for re-election, under which PAC was generally financed by individual contributions "largely . . . taken by shop stewards outside working hours." Id., at 5. Indeed, the amount of individual contributions actually collected by PAC evidences that it successfully informed CIO members that donations were not mandatory assessments. Cf. L. Overacker, Presidential Campaign Funds 61 (1946). From an estimated CIO membership of five million PAC might have collected $5 million at the requested rate of $1 a member. Yet the national PAC office, which received 50¢ of each $1 donated, obtained only $376,910.77 in 1944, S. Rep. No. 101, supra, n. 14, at 23, suggesting contributions by less than 800,000 CIO members. See also H. R. Rep. No. 2739, supra, n. 13, at 31 ($218,415.98 received in 1946).

[31] See infra, at 428–429.

[32] Indeed, in a letter to regional PAC directors, the national PAC office itself referred to the organization "as an instrumentality of the Congress of Industrial Organizations." S. Rep. No. 101, supra, n. 14, at 22. See also Hearing before the Senate Special Committee to

the executive board of the CIO, its program was adopted at the national CIO convention, and its relationship to the CIO was close at every level of organization.[33] Furthermore, union agents generally collected contributions, H. R. Rep. No. 2093, 78th Cong.,

Investigate Presidential, Vice Presidential, and Senatorial Campaign Expenditures on S. Res. 263, 78th Cong., 2d Sess., 19 (1944) (testimony of Sidney Hillman) ("We just speak and act for the C. I. O. organizations"); House Hearings, *supra,* n. 30, at 839–840 (testimony of state PAC president) (local PAC is agent of union local). It is true that Senator Taft stated at one point in the Senate debates that "[t]he PAC is a *separate* organization which raises its own funds for political purposes, and does so perfectly properly." 93 Cong. Rec. 6437 (1947) (emphasis added). But if meant to indicate anything more than that PAC had a *formal* identity separate from the CIO, this isolated statement was clearly inconsistent with well-known facts about the organization. Moreover, neither Taft nor any of his colleagues appears to have attached any particular significance to the statement. Nor can we, in view of Taft's endorsement of direct union electioneering through political newspapers paid for through subscriptions. See *supra,* at 406–408, 416–417. It is also true that the Attorney General in his letter to Senator Moore in 1944 opined that committees like PAC were not "labor organizations" within the meaning of the War Labor Disputes Act inasmuch as they were not bargaining agencies. See n. 17, *supra.* But the Senate Campaign Expenditures Committee, implicitly in 1945, and the House Committee, expressly in 1946, rejected that conclusion. See S. Rep. No. 101, *supra,* n. 14, at 23; H. R. Rep. No. 2739, *supra,* n. 13, at 43 (quoted in n. 15, *supra*). See also House Hearings, *supra,* n. 30, at 27 (whether PAC was a "labor organization" "highly debatable" in opinion of PAC counsel).

[33] The House Committee observed in its 1945 report, H. R. Rep. No. 2093, *supra,* n. 13, at 5:

"The relationship between the Political Action Committee and the Congress of Industrial Organizations is . . . close on every level of organization. Mr. Hillman is president of the Amalgamated Clothing Workers of America, as well as chairman of the Political Action Committee. The State political action committees typically utilize the existing mechanism of the Congress of Industrial Organizations State councils; and the local political action committees are similarly set up as committees of the Congress of Industrial Organizations locals."

2d Sess., 5 (1945), and the union leadership was instrumental in choosing candidates to be supported.[34] Thus, far from being a separate organization sprouting from the desires of the rank and file to engage in political action, PAC, the paradigm union political fund, was a medium for organized labor, conceived and administered by union officials, to pursue through the political forum the goals of the working man.[35] And the only prerequisite for its con-

[34] The national PAC organization did not endorse senatorial, congressional, state, or local candidates, but gave advice to state and local political action committees in that regard. The national organization did endorse President Roosevelt on May 17, 1944, when, in the words of Sidney Hillman, "substantially all of the C. I. O. international unions and the great majority of its State councils had already acted . . . ." House Hearings, *supra*, n. 30, at 8. The national organization also endorsed Vice President Truman. Candidates for Congress were apparently chosen for endorsement by state or local PAC committees composed of representatives of the international CIO unions after review of incumbents' voting records in consultation with the regional PAC offices. See S. Rep. No. 101, *supra*, n. 14, at 21; Senate Hearing, *supra*, n. 32, at 12–13, 20–22; House Hearings, *supra*, at 8, 39–41, 43–46, 709–712, 714–715, 725–728, 842–845, 896–898, 904, 906–908, 942–944, 949–950, 954–960, 977–979, 983–985, 993–995, 1001, 1003, 1006–1007. PAC's endorsement procedures were described in 1951 as follows: The chairman of the local political action committee, who was usually the union president, would consult with a prospective candidate together with a screening committee. If that committee acted favorably, the candidate would then be presented to the political action committee for a vote on formal endorsement. Any endorsement would then be reported to the constituent unions of the area PAC and to the state and national PAC offices, and activity in support of the candidate would get under way. J. Kroll, The CIO–PAC and How it Works, in The House of Labor 120, 122–123 (J. Hardman & M. Neufeld .eds. 1951).

[35] Accord, Overacker, *supra*, n. 30, at 61–62:

"Although the political action committee of the CIO was separately organized, and in most cases its separate identity was scrupulously preserved, it is hard to escape the conclusion that it was the *alter ego* of the organization which inspired it. The cir-

tinued operation after enactment of § 304 of the Labor Management Relations Act was that it be strictly financed by solicitations designed to result in knowing free-choice donations.

This conclusion, too, we find confirmed by § 205 of the Federal Election Campaign Act, *supra*, at 409–410. That provision expressly authorizes "the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes by a corporation or labor organization . . . ." The provision then states in a proviso clause that "it shall be unlawful for such a fund to make a contribution or expenditure by utilizing money or anything of value secured by physical force, job discrimination, financial reprisals, or the threat of force, job discrimination, or financial reprisal; or by dues, fees, or other monies required as a condition of membership in a labor organization or as a condition of employment . . . ." Thus, § 205 plainly permits union officials to establish, administer, and solicit contributions for a political fund. The conditions for that activity are that the fund be "separate" and "segregated" and that its contributions and expenditures not be financed through physical force, job discrimination, or financial reprisal or the "threat" thereof, or through "dues, fees, or other monies required as a condition of membership in a labor organization or as a condition of employment." The quoted language is admittedly subject to contrary interpretations. "Separate" could (and normally when juxtaposed to "segregated" would) be read to mean an apartness beyond "segregated"; "threat" could be construed as referring only to the expression of an actual intention to inflict

cumstances under which it came into being, the 'interlocking of directorates' at the top, and the close cooperation at the local level all point in that direction."

injury; and "dues, fees, or other monies required as a condition of membership in a labor organization or as a condition of employment" could be interpreted to mean only actual dues or assessments. But we think that the legislative history of § 205 establishes that "separate" is synonymous with "segregated"; that "threat" includes the creation of an appearance of an intent to inflict injury even without a design to carry it out; and that "dues, fees, or other monies required as a condition of membership in a labor organization or as a condition of employment" includes contributions effectively assessed even if not actually required for employment or union membership.

The Hansen amendment was an alternative to Representative Crane's proposal, which declared in relevant part, n. 25, *supra:*

"Nothing in this section shall preclude an organization from establishing and administering a *separate* contributory fund for any political purpose . . . , if all contributions, gifts, or payments to such fund are made *freely and voluntarily,* and are unrelated to dues, fees, or other moneys required as a condition of membership in such organization or as a condition of employment." (Emphasis added.)

The debate on the differences between the Crane and Hansen provisions did not involve this language when the Hansen amendment was first introduced and adopted by the House. See *ibid.* At that point Hansen merely indicated in general explanation of his amendment that a permissible fund had to be "separate," which in context clearly meant "segregated," see 117 Cong. Rec. 43379,[36] and that, although the law could not "control

---

[36] "This fund [Hansen stated] must be *separate* from any union or corporate funds, and contributions must be voluntary. To insure that contributions are voluntary, the amendment prohibits

the mental reaction" of a union member solicited by his union chief, *id.*, at 43381,[37] the monies obtained had to come "in a truly voluntary manner and without the employment of the kinds of threats or reprisals or other methods that are prohibited by this amendment." *Ibid.* Thus interpreted, the Hansen amendment, as its author explained, served the traditional purposes of § 610:

> "[T]he underlying theory of section 610 is that substantial general purpose treasuries should not be diverted to political purposes, both because of the effect on the political process of such aggregated wealth and out of concern for the dissenting member or stockholder. Obviously, neither of these considerations cuts against allowing voluntary political funds. For no one who objects to the organization's politics has to lend his support, and the money col-

the use by the *separate* political fund of any money or anything of value obtained by the use or threat of force, job discrimination, or financial reprisal, or by dues or fees, or other monies required as a condition of employment or membership in a labor organization . . . ." (Emphasis added.)

[37] "The essential prerequisite [Hansen said] for the validity of such political funds is that the contributions to them be voluntary. For that reason the final section of this amendment makes it a violation of section 610 to use physical force, job discrimination, financial reprisals or the threat thereof, in seeking contributions. This is intended to insure that a solicitor for COPE or BIPAC [union political funds] cannot abuse his organizational authority in seeking political contributions. Of course, nothing can completely erase some residual effects on this score, any more than the law can control the mental reaction of a businessman asked for a contribution by an individual who happens to be his banker, or of a farmer approached by the head of his local farm organization. The proper approach, and the one adopted here, is to provide the strong assurance that a refusal to contribute will not lead to reprisals and to leave the rest to the independence and good sense of each individual."

lected is that intended by those who contribute to be used for political purposes and not money diverted from another source." *Ibid.*

No one at that time disputed that the Crane and Hansen provisions were the same in these respects in codifying prior law.

After the conference committee had adopted the Hansen amendment, however, Crane inserted in the record a Wall Street Journal article suggesting that the Hansen amendment had been inspired by the AFL-CIO to overrule the Court of Appeals decision in this case by authorizing a union political fund even if it is not separate and distinct from the sponsoring union, and by altering the test of voluntariness to focus on the absence of force rather than on the contributor's intent to make a donation of his own free and knowing choice. See 118 Cong. Rec. 323-324.[38] Crane did not significantly elaborate on the article or specifically endorse each of the particular points it made.

Hansen rejoined that he "[stood] fully behind every word of the statement" he had made during the earlier debate on his amendment and "[repeated] . . . that the purpose and effect of my amendment is [*sic*] to codify and clarify the existing law and not to make any substantive

---

[38] In particular, the article quoted "a man at the Justice Department" as saying that " '[t]he (Hansen) provision . . . not only doesn't codify existing law, but it overrules existing law' "; stated that Hansen had "[ignored the Court of Appeals decision in this case] that holds that labor can raise campaign cash only through voluntary funds that are 'separate and distinct' from the sponsoring union"; asserted that under the Hansen amendment "union chiefs . . . wouldn't be required to tell members for what purpose the money [solicited] is going"; and quoted an Associate Deputy Attorney General as reporting the Government's position to be " 'that a contribution to a political fund [must] be not only "voluntary," in the sense of an absence of force, but also knowingly made.' "

changes in the law." *Id.,* at 328.[39]   He stated further
that his "amendment is consistent with the position taken
by the Justice Department in the brief it filed with the
U. S. Supreme Court in the Pipefitter case [which
charged that the contributions to the Pipefitters fund
'were assessed by the union as part of its dues struc-
ture'] . . . ," since his amendment prohibited financing
political funds through monies required for employment
or union membership.   His amendment, therefore, would
not have the effect of "thwarting" that prosecution.
*Id.,* at 328–329 (emphasis omitted).   Hansen stated,
too, that his "amendment is also consistent with the pro-
visions of the so-called Crane amendment dealing with the
legality of a separate, voluntary political fund." *Ibid.*
The only difference he appears to have seen between
his amendment and the text of the Crane provision
quoted above was that the one made explicit what the
other treated implicitly.   Hansen explained:

> "[A]s Senator DOMINICK stated, speaking in sup-
> port of an amendment to section 610 he offered
> to the other body, the general view is that:
> "'If a member wishes to pay money voluntarily
> to a candidate or to a labor organization fund for
> a candidate or even to a fund which the union will
> determine how it is to be spent, I have no objec-
> tions.'   [117 Cong. Rec. 29329.[40]]
> "The Hansen amendment building on this con-
> sensus tracks this language with a single addition

---

[39] At this point Representative Hays, a supporter of the Hansen
amendment, interjected, 118 Cong. Rec. 328:

"I will say to the gentleman that what he is saying will be the
legitimate legislative history and that what somebody down in
the Department of Justice, some Assistant Attorney General's opin-
ion [see n. 38, *supra*], is worth exactly as much as the piece of
paper it is printed on, no more and no less."

[40] See also 117 Cong. Rec. 43380 (Hansen quoting approvingly
same statement by Sen. Dominick).

making explicit what is implicit in the Crane amendment—that unions and corporations may solicit contributions to these funds as long as they do so without attempting to secure money through 'physical force, job discrimination, financial reprisals' or the threat thereof. Thus the Hansen amendment does not break new ground, it merely writes currently accepted practices into clear and explicit statutory language." *Id.*, at 329.

Crane made no reply to these assertions.

We conclude from this legislative history that the term "separate" in the Hansen amendment is synonymous with "segregated." Nothing in the legislative history indicates that the word is to be understood in any other way. To the contrary, Hansen's comments in general explanation of his amendment support that interpretation, as does the use of the term in the Crane provision, with which, Hansen said, his amendment was consistent. Moreover, Hansen did not deny that his amendment departed from the Court of Appeals' insistence in the *Pipefitters* decision that a permissible political fund be separate and distinct from the sponsoring union; instead, he merely found his amendment consistent with the Government's argument before this Court that political contributions and expenditures cannot be made from dues or assessments. Finally, both the Crane and the Hansen amendments expressly authorize unions to establish and administer voluntary political funds. The Hansen amendment also expressly authorizes union officials to solicit contributions and, as the quoted statement of Senator Dominick indicates, further permits them to determine the disposition of the monies raised. In these circumstances, it is difficult to conceive how a valid political fund can be meaningfully "separate" from the sponsoring union in any way other than "segregated."

Similarly, we conclude that the term "threat" and the phrase "dues, fees, or other monies required as a condition of membership in a labor organization or as a condition of employment" must be read broadly to encompass solicitation schemes that do not make plain the political nature of the union fund and the freedom of the individual solicited to refuse to contribute without reprisal. The term and the phrase, in other words, include apparent as well as actual threats and dues or assessments respectively. Again, Hansen's explanatory statements are all consistent with that interpretation. Even his observation that the law cannot "control the mental reaction" of a union member approached by a union official seems better taken simply as justification for allowing solicitation by union officials at all rather than as condoning the use of tacit force or pressure. Moreover, if the Hansen amendment is to be construed, as Hansen indicated it should be, *in pari materia* with the Crane provision, it, too, must require that donations be made "freely and voluntarily." Likewise, if the amendment is meant, as Hansen said it was, to embrace the Government's position in this case, we merely implement his purpose by interpreting "dues, fees, or other monies required as a condition of membership in a labor organization or as a condition of employment" as including not only actual but also effective dues or assessments.

Construed as we have done, § 205 of the Federal Election Campaign Act does nothing more than accomplish the expressed purpose of its author—that is, codify and clarify prior law. But since we have arrived at our interpretation without reference to prior law, § 205 once again throws on § 610 as embodied in § 304 of the Labor Management Relations Act "a cross light" that confirms our understanding of the law applicable to this prosecution.

*Third.* Arguably, however, there is one change effected by § 205 material to this case, and that is with regard to the *use* of general union monies for the establishment, administration, and solicitation of contributions for political funds. Section 304 of the Labor Management Relations Act may be interpreted to prohibit such use, while the Hansen amendment plainly permits it.

As we have seen, *supra*, at 403, PAC was initially financed from general union treasuries. After the nomination of President Roosevelt for re-election, however, the costs of administration of PAC as well as its political expenditures were mainly, although not entirely, financed from a segregated account of voluntary individual donations. The House campaign expenditures committee explained in its 1945 report, H. R. Rep. No. 2093, 78th Cong. 2d Sess., 5 (1945):

"[I]t is not . . . possible completely to separate the resources and facilities made available to the Political Action Committee even after July 23, 1944 [when Roosevelt became a candidate for re-election], from those of the Congress of Industrial Organizations and its unions. On the national level and in most States that separation appears to have been preserved so far as cash income and cash expenditures for strictly Political Action Committee as distinguished from union activities are concerned. The local distribution of Political Action Committee literature, for example, has been largely handled by volunteers on their own time; and the contributions have largely been taken by shop stewards outside working hours. But no such separation has proved possible where the use of union offices [41] and office

---

[41] Compare Senate Hearing, *supra*, n. 32, at 41 (regional PAC offices, to Sidney Hillman's knowledge, separate from CIO offices, as "we don't like them to mix their union business with political activities"), and House Hearings, *supra*, n. 30, at 717, 901 (testimony

personnel is concerned. Union personnel assigned to full-time Political Action Committee work have typically been transferred from the union to the Political Action Committee pay roll. But the part time Political Action Committee services of persons who are both union and Political Action Committee officers cannot be thus readily segregated."

In endorsing PAC in the enactment of § 304 of the Labor Management Relations Act, Congress clearly had in mind PAC's financial structure after July 1944. Congress, therefore, may have considered that PAC's activities in the future could be financed only from voluntary donations separate from union dues and assessments, except for incidental expenses such as office space and part-time personnel. Alternatively, in view of the emphasis on protecting minority union interests and maintaining a strict segregation of funds, Congress may have thought that all of PAC's activities, including the costs of administration and solicitation of contributions, had to be paid for exclusively from voluntary contributions. The evidence is strong at least that Congress believed the costs of organization of new union political funds had to be financed in that way. See, *e. g.,* S. Rep. No. 101, 79th Cong., 1st Sess., 24 (1945) (statement by Sens. Ball and Ferguson, quoted, *supra,* at 404).

In contrast, the Hansen amendment provides that "it shall be unlawful for such a fund to make a contribution or expenditure by utilizing money or anything of value secured" in a prohibited way. Conceivably this language could be read to forbid making contributions or expenditures through the establishment or administration of a political fund or through the solicitation of

of regional PAC directors) (regional office financed from national PAC headquarters), with House Hearings, *id.,* at 717–718, 736, 841, 857–861, 867–868, 872 (overlapping use of offices on state and local level).

donations financed by general union monies. But that is neither the plain meaning nor, as the legislative history of § 205 shows, the intended construction of the provision. When the Hansen amendment was first introduced, its sponsor explained:

> "As a further safeguard [against the use of a compulsory fund for political purposes] the proviso also makes it a violation for such a fund to make a contribution or expenditure from money collected as dues or other fees required as a condition of membership or employment or obtained through commercial transactions. This insures that any money, service, or tangible item—such as a typewriter, Xerox machine, and so forth—provided to a candidate by such a fund must be financed by the voluntary political donations it has collected." 117 Cong. Rec. 43381.

At no point in the debate on § 205 did Hansen suggest that his amendment was to be read more broadly than this, despite the fact that the Wall Street Journal article inserted in the record by Representative Crane specifically charged that "union chiefs could use dues money to pay for the soliciting . . . ." 118 Cong. Rec. 323. Furthermore, the exemption for the establishment, administration, and solicitation of contributions for voluntary political funds was but one of three exceptions to the general rule prohibiting corporations and labor organizations from making contributions or expenditures in connection with federal elections. The other two exceptions were communications to, and nonpartisan registration and get-out-the-vote campaigns aimed at, stockholders or union members and their families. In explaining the three exemptions, Hansen clearly regarded each of them as a permissible activity to be financed by general union funds, for each, in his view, was an activity where group

interests predominated[42] and "the interest of the minority [was] weakest . . . ." 117 Cong. Rec. 43380.

"At the present time [Hansen summarized] there is broad agreement as to the essence of the proper balance in regulating corporate and union political activity required by sound policy and the Constitution. It consists of a strong prohibition on the use of corporate and union treasury funds to reach the general public in support of, or opposition to, Federal candidates and a limited permission to corporations and unions, allowing them to communicate freely with members and stockholders on any subject, to attempt to convince members and stockholders to register and vote, and to make political contributions and expenditures financed by voluntary donations which have been kept in a separate segregated fund. This amendment writes that balance into clear and unequivocal statutory language." *Id.,* at 43381.

---

[42] With the exemption for communications to stockholders or union members and their families apparently in mind, Hansen stated, for example, 117 Cong. Rec. 43380:

"[E]very organization should be allowed to take the steps necessary for its growth and survival. There is, of course, no need to belabor the point that Government policies profoundly affect both business and labor. . . . If an organization, whether it be the NAM, the AMA or the AFL–CIO, believes that certain candidates pose a threat to its well-being or the well-being of its members or stockholders, it should be able to get its views to those members or stockholders. As fiduciaries for their members and stockholders the officers of these institutions have a duty to share their informed insights on all issues affecting their institution with their constituents. Both union members and stockholders have the right to expect this expert guidance."

This reasoning, of course, applies as well to solicitations for contributions to voluntary political funds.

Thus, § 205 may in one respect have impliedly repealed the substantive law relating to this prosecution.[43] But we need not now decide that question, because even if there has been such an implied repeal, it would not affect this prosecution for reasons to which we now turn.

## II

The rule is well established that prosecutions under statutes impliedly or expressly repealed while the case is still pending on direct review must abate in the absence of a demonstration of contrary congressional intent or a general saving statute. For, "[p]rosecution for crimes is but an application or enforcement of the law, and if the prosecution continues the law must continue to vivify it." *United States* v. *Chambers,* 291 U. S. 217, 226 (1934). This doctrine had its earliest expression in *United States* v. *Schooner Peggy,* 1 Cranch 103 (1801), and has since "been consistently recognized and applied by this Court." *Bell* v. *Maryland,* 378 U. S. 226, 231 n. 2 (1964). As Chief Justice Hughes observed in *Chambers, supra,* at 226, "The principle involved is . . . not archaic but rather is continuing and vital,—that the people are free to withdraw the authority they have conferred and, when withdrawn, . . . the courts [cannot] assume the right to continue to exercise it."

In this case, however, although we do not find a demonstration of contrary congressional intent that would

---

[43] See, *e. g., United States* v. *Tynen,* 11 Wall. 88, 92 (1871): "[I]t is a familiar doctrine that repeals by implication are not favored. When there are two acts on the same subject the rule is to give effect to both if possible. But if the two are repugnant in any of their provisions, the latter act, without any repealing clause, operates to the extent of the repugnancy as a repeal of the first . . . ."

overcome application of this rule if applicable,[44] we do hold that the general federal saving statute, 61 Stat. 635, 1 U. S. C. § 109, operates to nullify any abatement of the prosecution. That statute provides in pertinent part:

> "The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability."

In *United States* v. *Reisinger,* 128 U. S. 398 (1888), the Court reviewed an indictment, returned in 1885, alleging that the defendant, an attorney, had in 1883 charged

---

[44] The Government in response to the questions posed in n. 10, *supra,* argues that "[h]ere there is no problem of inferring legislative intent because Congress [in the House debates] clearly expressed its intention that pending prosecutions should not abate." Supplemental Brief for the United States 7. Representative Hansen, to be sure, did state in the debate that this prosecution would not abate. See *supra,* at 425. But he also indicated that the effect of his amendment on pending cases was not, and should not be, a matter of concern:

"Obviously, the members of the joint Senate-House conference committee were not concerned about the suggested effect of this amendment on pending cases. Nor were Members of the other body who approved the conference report by a voice vote. There is no reason for Members of this body to be concerned. This is much needed and meritorious legislation? I strongly urge an overwhelming vote of approval." 118 Cong. Rec. 329.

More important, Hansen's view that this prosecution would continue was possibly premised, as we have seen, on a mistaken understanding of what § 610 previously provided in terms pertinent to this case. If his understanding was, in fact, mistaken, we would have to assume that Congress would intend the general rule of abatement "applicable as part of the background against which [it] acts," *Hamm* v. *Rock Hill,* 379 U. S. 306, 314 (1964), to prevail.

434

clients in pension cases against the Government $100 and $50 respectively in violation of a $10 maximum fee established by Act of Congress, June 20, 1878, 20 Stat. 243. Despite the fact that Congress had expressly repealed that Act and raised the maximum permissible fee in pension cases to $25 in 1884, Act of Congress, July 4, 1884, § 3, 23 Stat. 99, the Court sustained the indictment on the basis of the federal saving statute. In *Hamm* v. *Rock Hill*, 379 U. S. 306 (1964), on the other hand, we held that the saving statute would not nullify abatement of federal prosecutions for trespass in public luncheon facilities following enactment of the public accommodation requirements of the Civil Rights Act of 1964. We explained, *id.*, at 314:

> "The federal saving statute was originally enacted in 1871, 16 Stat. 432. It was meant to obviate mere technical abatement such as that illustrated by the application of the rule in [*United States* v. *Tynen*, 11 Wall. 88,] decided in 1871. There a substitution of a new statute with a greater schedule of penalties was held to abate the previous prosecution. In contrast, the Civil Rights Act works no such technical abatement. It substitutes a right for a crime. So drastic a change is well beyond the narrow language of amendment and repeal. It is clear, therefore, that if the convictions were under a federal statute they would be abated."

The instant case is controlled by *Reisinger* rather than by *Hamm*. Section 205 of the Federal Election Campaign Act may, of course, make lawful what was previously unlawful—namely, the financing of the establishment, administration, and solicitation of contributions for voluntary political funds from general union monies. But § 205 does not, in any event, "[substitute] a right for a crime." To the contrary, as in *Reisinger* and *Tynen*, it

retains the basic offense—contributions or expenditures by labor organizations in connection with federal elections are still forbidden so long as they are paid for from actual or effective dues or assessments. We therefore hold that even if there has been an implied repeal of § 610, petitioners remain punishable under that provision. We turn now to determine whether the convictions below have been returned consistently with that law.

### III

The Government urges:

> "The essential charge of the indictment and the theory on which the case was tried was that the [Pipefitters] Fund, although formally set up as an entity independent of Local 562, *was in fact a union fund, controlled by the union,* contributions to which were assessed by the union as part of its dues structure, collected from non-members in lieu of dues, and expended, when deemed necessary, for union purposes and the personal use of the directors of the Fund." Brief for the United States 23 (emphasis added).

See also Brief for the United States in Opposition to the Petition for Certiorari 11–12.[45] This was indeed, as we shall shortly see, the theory on which the indictment was drawn, the jury was instructed, and petitioners' convictions were affirmed. It is also the construction of

---

[45] The Government in response to the questions posed in n. 10, *supra,* confirms that this was the theory of the prosecution:

"In short, the case was tried on the theory that the fund here involved was *not* the kind of a fund which the amended statute permits but was the kind of a fund which was and still is a violation of Section 610—a fund which, while ostensibly separate, was in fact a union fund, supported by money collected as union money and used, when deemed desirable, as general union funds." Supplemental Brief for the United States 5 (emphasis in original).

§ 610 that we have rejected in favor of the Government's narrower construction that the prerequisite for a permissible political fund is simply that it not be financed by actual or effective dues or assessments. See *supra*, at 413–414. On the other hand, we find that the indictment may be read to allege not only that the Pipefitters fund was "a union fund, controlled by the union," but that "contributions to [it] were assessed by the union as part of its dues structure, [and were] collected from non-members in lieu of dues . . . ." For reasons that follow, however, we do not now construe the indictment as making this essential allegation, but leave that question open for determination on remand. We hold now only that the jury instructions failed to require proof of the essential element for conviction, and hence reverse the judgment below.

*First.* Petitioners moved before trial to dismiss the indictment on the following ground, App. 28:

> "The gist of the indictment is to allege that Section 610 . . . prohibits labor unions from forming parallel political organizations which receive voluntary contributions from the members of the union to be contributed and expended in Federal elections. Congress intended such political organizations to be legally authorized. Thus, the indictment fails to state an offense . . . ."

Petitioners also moved for a bill of particulars, *id.*, at 30:

> "whether it is the government's position and theory of the case that the mere fact that the [Pipefitters fund] was established, maintained, and administered by members, officers, employees, agents, foremen and shop [stewards] of Local 562 is, in and of itself, sufficient to make said Fund, under the law, a Fund of Local 562[;] . . . whether or not it is the govern-

ment's position that Section 610 . . . prohibits the members, officers, employees, agents, foremen and shop [stewards] of a union from establishing any political organization or fund for the purpose of making contributions and expenditures in connection with [federal] elections . . . [;] . . . whether it is the government's position and theory of the case that the alleged 'regular and systematic collection, receipt, and expenditures of money obtained from working members of Local 562 and from working members of other labor organizations employed under jurisdiction of the defendant Local 562' were voluntary or involuntary collections and contributions." [46]

In a memorandum in opposition to the motion to dismiss, the Government acknowledged petitioners' argument "that the indictment is defective in that it does not allege that the funds involved were not voluntary" and took the position that "[p]roof of the offense charged here does not depend upon whether the funds were volunteered or not by union members. The issue is whether these funds were the general funds of Local 562," *id.,* at 56, which the indictment, in the Government's view, impliedly charged in alleging that petitioners " 'unlawfully, wilfully and knowingly did conspire and agree with each other . . . to violate Section 610 . . . .' " *Id.,* at 54. The trial court overruled each of petitioners' motions without opinion.

On appeal the Court of Appeals adopted the Government's theory of the case. First, it ruled that by implication "[t]he gist of the government's claim as reflected by the indictment is that the money in the fund is in

---

[46] These inquiries were addressed to paragraphs 7, 10, and 17 of the indictment, see n. 2, *supra.* Comparable inquiries were generally leveled at other pertinent paragraphs of the indictment.

truth and in fact money belonging to Local 562." 434 F. 2d, at 1120.[47] The court then held, *ibid.*:

> "The failure of the indictment to allege that the payments to the fund were involuntary is not fatal. . . . If [the allegation that the money in the fund is in fact Union money] is established by the evidence, the issue of whether the payment to the fund is voluntary or involuntary is not controlling.
>
> "Of course as observed by the [trial] court in its instructions, the issue of whether the payments to the fund were voluntary is relevant and material on the issue of whether the fund is the property of Local 562. Other considerations such as the intention of the donors as to ownership and control of the fund also bear upon the issue."

This account of the proceedings below indicates that the question of the voluntariness of the contributions to the Pipefitters fund was regarded both at trial and on appeal as a matter relating to, but not essential for the basic charge of the indictment that Local 562 concealed political contributions of Union monies through the subterfuge of a Union-controlled fund. This theory, of course, flies in the face of the legislative history of

---

[47] The court arrived at this conclusion on the basis of *United States* v. *Lewis Food Co., supra,* n. 28, where the Court of Appeals for the Ninth Circuit sustained an indictment under § 610 that failed to allege expressly that an expenditure by a corporation in connection with a federal election was financed from the general corporate treasury (or, as discussed in n. 28, *supra,* that it was made against the wishes of an individual stockholder).

"In our opinion [the court there explained], the allegation in the indietment that the corporation made an 'expenditure' for the stated purpose, necessarily infers [*sic*] an allegation that general corporate funds were used. Corporate expenditures normally come from a corporation's general funds and not from some independent fund contributed by shareholders or otherwise obtained." 366 F. 2d, at 713.

§ 610. The impressive lesson of that history in this regard is that the political contributions in issue violated § 610 if, and only if, payments to the fund were actually or effectively required for employment or union membership. In other words, the essence of the crime in this respect is whether the method of solicitation for the fund was calculated to result in knowing free-choice donations. Whether the fund was otherwise controlled by the Union is immaterial.

We think, nevertheless, that the indictment may be read, consistently with the proper interpretation of § 610, to allege that the contributions to the Pipefitters fund derived from effective dues or assessments.[48] But

---

[48] The heart of the indictment is found in paragraph 10, which states, *supra*, n. 2:

"It was a part of said conspiracy that the defendants . . . would establish and maintain a special fund . . . , which fund would have the appearance of being a wholly independent entity, separate and apart from Local 562; and that the defendants . . . would thereby conceal the fact that Local 562 would make contributions and expenditures in connection with [federal] elections . . . ."

As in *Lewis Food Co., supra,* n. 47, it is a fair inference from this allegation that the union made prohibited political contributions and expenditures from general union monies rather than from the knowing free-choice donations of individual members. Moreover, the indictment not only expressly alleges that collections for the fund were "regular and systematic" at an established rate, see paragraphs 7, 13, 15, and 16 of the indictment, *supra,* n. 2, but specifically charges in paragraph 14, *ibid.* (emphasis added):

"It was further a part of the conspiracy that the defendants . . . would waive and fail to enforce Section 180 of the Constitution of the United Association in order to facilitate the payment of monies into the Fund, *by failing to collect* from non-members of Local 562, working under its jurisdiction, *a required travel card fee* of not in excess of Eight Dollars ($8.00) per month, *and in lieu thereof, collecting payments to the Fund at the rate of Two Dollars ($2.00) per eight-hour working day* from such non-members."

These allegations together, although not a model of clarity, might (but we do not now decide for the reasons stated in the text) consti-

whether the indictment should now be construed in light of the proceedings below to make this allegation is an altogether different question.[49] Since this precise question was not addressed below and has not been briefed or argued before us and since the case must, in any event, be remanded, whereupon the issue may become moot,[50] we do not now undertake to decide it. Instead, in the event that the Government chooses to proceed with the indictment before us, petitioners shall have leave to renew their motion to dismiss.

*Second.* The jury instructions embody an interpretation of § 610 that is plainly erroneous. The trial court refused requests by petitioners for instructions that the jury should acquit if it found that contributions to the Pipefitters fund were made voluntarily.[51] Adopting a

---

tute "a plain, concise and definite" statement, within the meaning of Rule 7 (c) of the Federal Rules of Criminal Procedure, that the conspiracy included the actual or effective assessment of contributions to the Pipefitters fund as part of the Union's compulsory dues structure.

[49] Compare, *e. g., Hagner* v. *United States,* 285 U. S. 427 (1932); *United States* v. *Comyns,* 248 U. S. 349 (1919), and *Dunlop* v. *United States,* 165 U. S. 486 (1897), with, *e. g., United States* v. *Boston & M. R. Co.,* 380 U. S. 157, 159 n. 1 (1965), and *Russell* v. *United States,* 369 U. S. 749 (1962).

[50] Although two of the petitioners died pending decision in this case, see n. 11, *supra,* the Government may decide on remand to seek a new indictment against the remaining petitioners. The present indictment charges that the conspiracy continued up to the date of the indictment, May 9, 1968, and that an overt act was committed in furtherance of the conspiracy on July 14, 1967, in which case it does not appear that the five-year statute of limitations governing noncapital offenses has run. See 18 U. S. C. § 3282; *Grunewald* v. *United States,* 353 U. S. 391, 396–397 (1957). See also *United States* v. *Reisinger,* 128 U. S. 398 (1888) (indictment valid, though returned after law repealed).

[51] Petitioners offered seven instructions on "voluntariness." Two merely used the term without further definition, while others referred to whether the contributions constituted union dues or

contrary view, the court instructed the jury, over petitioners' objections, that it should return verdicts of guilty if the fund "was in fact a union fund, . . . the money therein was union money, and . . . the real contributor to the candidates was the union." "In determining whether the Pipefitters Voluntary Fund was a bona fide fund, separate and distinct from the union or a mere artifice or device," the jury was further instructed to "take into consideration all the facts and circumstances in evidence, and in such consideration . . . [to] consider" 19 factors, several of which related to the regularity, rate, method of collection, and segregation from Union monies of payments to the fund. Others concerned the kinds of expenditures the fund made and the Union's control over them. Still others involved whether the payments to the fund were made voluntarily. In the latter regard the court charged (emphasis added):

> "A great deal of evidence has been introduced on the question of whether the payments into the Pipefitters Voluntary . . . Fund by members of Local 562 and others working under its jurisdiction were voluntary or involuntary. This evidence is relevant for your consideration, along with all other facts and circumstances in evidence, in determining whether the fund is a union fund. *However, the mere fact that the payments into the fund may have been made voluntarily by some or even all of the contributors thereto does not, of itself, mean that the money so paid into the fund was not union money.*" See n. 9, *supra*.

assessments or were made by the donors for political purposes. See App. 1096–1100. Hereafter, proper instructions on the question of voluntariness may be framed in terms of the application to the proofs of the language of § 205 of the Federal Election Campaign Act as herein construed. See *supra*, at 421–427.

On appeal the Court of Appeals did not address the validity of these instructions other than to agree with the trial judge that "the issue of whether the payments to the fund were voluntary is relevant and material [but not determinative] on the issue of whether the fund is the property of Local 562." *Supra*, at 438.

The instructions, as the Court of Appeals confirmed, clearly permitted the jury to convict without finding that donations to the Pipefitters fund had been actual or effective dues or assessments. This was plain error.[52]

The judgment of the Court of Appeals as to petitioners Callanan and Lawler is vacated, and the case is remanded to the District Court with directions to dismiss the indictment against them. See n. 11, *supra*. The judgment of the Court of Appeals as to petitioners Local 562 and Seaton is reversed, and the case is remanded to the District Court for proceedings as to them consistent with this opinion.

*It is so ordered.*

Mr. Justice Blackmun took no part in the consideration or decision of this case.

Mr. Justice Powell, with whom The Chief Justice joins, dissenting.

The decision of the Court today will have a profound effect upon the role of labor unions and corporations in

---

[52] The Court of Appeals did not directly rule on the validity of the instructions because, in the majority's view, petitioners had failed to preserve their objections on appeal. See 434 F. 2d, at 1125. See also *id.*, at 1128 (Matthes, C. J., concurring). The dissent below makes a strong argument to the contrary, see *id.*, at 1135 (Lay, J.), but we need not address the question, since the instructions were plainly erroneous, the claim of error was brought to the attention of the trial court, and we may notice a plain error not presented. See, *e. g.*, *Silber* v. *United States*, 370 U. S. 717 (1962). See also 434 F. 2d, at 1130 (Heaney, J., dissenting), 1135 (Lay, J., dissenting).

the political life of this country. The holding, reversing a trend since 1907, opens the way for major participation in politics by the largest aggregations of economic power, the great unions and corporations. This occurs at a time, paradoxically, when public and legislative interest has focused on limiting—rather than enlarging—the influence upon the elective process of concentrations of wealth and power.

## I

The majority opinion holds that *unions* lawfully may make political contributions so long as they come from funds voluntarily given to the union for such purpose. The Court seeks to buttress this holding by a long and scholarly presentation of the legislative history of 18 U. S. C. § 610. But some of that history invites conflicting inferences, and the background of § 205 of the Federal Election Campaign Act of 1971, to which the majority also devotes extensive attention, is of dubious value in interpreting an earlier statute which on its face is clear and unambiguous.[1]

In its preoccupation with the legislative history, the Court has overlooked the central point involved in this case: that the conviction of petitioners accords with the plain language of the controlling statute. Nor does the majority demonstrate an ambiguity in that statutory language that makes relevant its long journey into the legislative history.

The operative language of § 610 states that: "It is unlawful . . . for any corporation whatever, or any labor

---

[1] The majority opinion finds confirmation of its interpretation of the legislative history of § 610 in the recently enacted § 205 of the Federal Election Campaign Act of 1971. The majority concludes, however, that § 205 is not retroactive and therefore is inapplicable to this case, a view which I share. I find it unnecessary to the disposition of this case to intertwine the legislative history of the two statutes when only one of them is applicable.

organization to make a contribution or expenditure in connection with" any federal election. Despite this unqualified proscription, the majority opinion sustains the right of unions and corporations to make political contributions *directly,* provided only that the funds therefor come voluntarily from members, employees, or stockholders and are maintained separately from the other funds of the union or corporation.[2] With all respect, this holding is precisely contrary to the express language of the law. At the risk of unnecessary repetition I set forth in juxtaposition the operative language in § 610 as contrasted with that of the Court's holding:

| *Section 610* | *Court's Holding* |
|---|---|
| "It is unlawful . . . for . . . any labor organization to make a contribution or expenditure in connection with any [federal] election . . . ." | "[Section] 610 does not apply to union contributions and expenditures from political funds financed in some sense by the voluntary donations of employees." *Ante,* at 409. |

If words are given their normal meaning, the statute and the Court's holding flatly contradict each other. One says that it shall be unlawful for a union to make a political contribution or expenditure. The other says this is perfectly lawful, so long as the funds which the union contributes or expends were donated freely and knowingly. The Court has simply added a qualification,

---

[2] The alleged separate fund involved in this case was segregated only in the sense that there was a separate ledger and bank account. The Court of Appeals held that there was "substantial evidence to support a jury finding that the fund was not a bona fide separate and distinct entity." 434 F. 2d 1116, 1121 (1970). The decision of the majority focuses attention on the issue of voluntariness and gives little indication that a more realistic segregation of the fund is required.

not found in the statutory language, which significantly changes the meaning of this Act of the Congress.

The Court's holding, moreover, directly counters the purposes for which § 610 was enacted. Congress passed this legislation to restrict and minimize the influence corporations and unions might exert on elections. In *United States* v. *CIO*, 335 U. S. 106, 113 (1948), with respect to corporations, the Court stated:

> "This legislation seems to have been motivated by two considerations. First, the necessity for destroying the influence over elections which corporations exercised through financial contribution. Second, the feeling that corporate officials had no moral right to use corporate funds for contribution to political parties without the consent of the stockholders."

In commenting on the reasons for extending the legislation to labor organizations, the Court in the same case observed:

> "Its legislative history indicates congressional belief that labor unions should then be put under the same restraints as had been imposed upon corporations. It was felt that the influence which labor unions exercised over elections through monetary expenditures should be minimized, and that it was unfair to individual union members to permit the union leadership to make contributions from general union funds to a political party which the individual member might oppose." *Id.*, at 115.

The two principal motivations for the enactment of § 610, as identified in *CIO*, are (i) the minimizing of influence of labor unions (as well as corporations) on elections "through monetary expenditures"; and (ii) the elimination of the unfairness "to individual union members" of allowing union management to make political

contributions from general union funds. It seems self-evident that both of these legislative purposes will be frustrated by the Court's holding that, despite the language of the statute forbidding union contributions, unions may now make political contributions and expenditures, provided only that the source of a fund is voluntary.

To be sure, there is some language in the congressional debates which emphasizes the freedom of union members, as well as that of employees and stockholders of corporations, to make uncoerced political contributions. No one contests this basic freedom. But whatever may have been said in congressional debates, courts are bound by what is written into legislation. If the language of a statute is clear and unambiguous there is no occasion to resort to legislative history. Nor can such history, however illuminating it may seem, be relied upon to contradict, or dilute, or add unspecified conditions to statutory language which is perfectly clear. Where statutory provisions were "clear and unequivocal on their face," the Court has found "no need to resort to the legislative history of the Act." *United States* v. *Oregon,* 366 U. S. 643, 648 (1961). As Justice Black observed, "[n]o legislative history can justify judicial emasculation" of the unambiguous language of a statute. *Maryland Casualty Co.* v. *Cushing,* 347 U. S. 409, 437 (1954) (dissenting).[3]

## II

Accepting, as I think we must, § 610 as written, the issue in this case is whether the political fund of Local

---

[3] It has been an ancient and cardinal tenet of statutory construction that "where a law is expressed in plain and unambiguous terms, whether those terms are general or limited, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction." *Lake County* v. *Rollins,* 130 U. S. 662, 670–671 (1889); *Yates* v. *United States,* 354 U. S. 298, 305 (1957); *United States* v. *Standard Brewery,* 251 U. S. 210, 217 (1920).

562 was in reality a sham or subterfuge through which the union itself made the contributions forbidden by the statute. The indictment in this case was framed on this basis, and the jury was so instructed. The question properly addressed by the Court of Appeals was "whether the contributions or expenditures were [in fact] made by a labor organization." 434 F. 2d 1116, 1121 (1970). After summarizing the evidence submitted to the jury on this issue, the Court of Appeals concluded:

> "There is substantial evidence to support a jury finding that the fund was not a bona fide separate and distinct entity but was in fact a device set up to circumvent the provisions of § 610 and that the fund constituted union money." 434 F. 2d, at 1121.

It is not normally the function of this Court in a case of this kind to determine whether a jury verdict is supported by substantial evidence. It may not be inappropriate, however, to say—in light of the record before us—that the evidence was more than sufficient to show that union officials supervised closely the collection of the "contributions," sought "contributions" in much the same manner as compulsory assessments, viewed them as part of the total cost burden which the union member had to bear, expended them freely both for union projects and political purposes, and so generally commingled the administration of the fund with the administration of the union as to entitle the jury to believe the gifts by Local 562 from the fund to candidates for federal office constituted union political contributions in violation of § 610.[4]

---

[4] Even on the issue of voluntariness, which the Court of Appeals rightly found "relevant and material" though "not controlling," 434 F. 2d, at 1120, the evidence was impressive that the collection scheme was inherently coercive. Since Local 562 had consistently collected contributions to its political funds since 1949, "contributions" appear to have become a customary *de facto* condition to union membership

The majority opinion of this Court does not contest this view. It concludes, rather, that the jury was erroneously instructed, and that accordingly the verdict and judgment must be set aside. If a new trial is held, the jury must be instructed in accordance with the Court's interpretation of § 610 that a union may lawfully make political contributions from a fund it collects and administers so long as the payments into it are voluntary.

It is from this interpretation of § 610—one which in my view will render the statute largely ineffectual—that I dissent.[5]

### III

The consequences of today's decision could be far-reaching indeed. The opinion of the Court provides a blueprint for compliance with § 610, as now construed,

---

or employment within Local 562's jurisdiction. Moreover, the regularity of these contributions—week by week and year by year and each in the same amount as requested by the union—seems suspiciously incompatible with the concept of free-will gifts.

[5] My interpretation of the statute does not imply that no "separate fund" would be permissible. I recognize that, consistently with the statute (as amended by § 205), a union or corporation may be instrumental in establishing a political fund, provided it is a bona fide one—separate and segregated from the union in a genuine, not merely formalistic, way. For example, such a fund might be managed by a separate nonprofit entity, with independent trustees not subservient to the union or corporate sponsor, who engage independent auditors, who make regular reports to contributors, and who provide realistic means by which contributors can express their preference as to political candidates or parties. Safeguards would be required to assure that contributions were not coerced, either directly or by means of an inherently coercive system or relationship. Such a bona fide fund would contrast quite sharply with that operated by Local 562, where there were no bylaws, no constitution, no independent trustees, no audit, no report to contributors, or other indications of genuine separateness or segregation; and where the union itself collected, operated, and expended the "contributions" in substantially the same manner as union dues and assessments.

which will be welcomed by every corporation and union which wishes to take advantage of a heretofore unrecognized opportunity to influence elections in this country.[6]

It may be that the unions, by virtue of a system of collecting "political contributions" simultaneously with the collection of dues and regularizing such collections to the point where they are indistinguishable from dues, will be the primary beneficiaries. But the corporations are more numerous than the unions. They have millions of stockholders and hundreds of thousands of nonunion employees. Both unions and corporations have large financial resources. Today's interpretation of § 610 will enable a more direct and extensive political employment of these resources by both union and corporation.

By refusing to affirm the judgment below, the majority renders the ultimate fate of this litigation uncertain. If, on remand, the techniques of Local 562 should be sanctioned, other unions and corporations could easily follow Local 562 and obtain from members, employees, and shareholders a consent form attesting that the contribution (or withholding) is "voluntary." The trappings of voluntariness might be achieved while the substance of coercion remained. Union members and corporate employees might find themselves the objects of regular and systematized solicitation by the very agent which exercises direct control over their jobs and livelihood.

---

[6] I recognize, of course, that the recent enactment of § 205 of the Federal Election Campaign Act of 1971 has supplemented and extended § 610 in defining permissible limits of union and corporate contributions. But § 205 still leaves intact the operative language of § 610 which explicitly proscribes political contributions by unions and corporations. The interpretative gloss today added unnecessarily on this language will result in rendering ineffectual the basic intention of the Congress to prevent the intrusion of corporate and union power into our political system.

The only remaining requirement to meet the new standards is that the fund be separate from other union or corporate funds, although under the majority's interpretation of § 205 it may be established and administered, and the contributions to it solicited, by the union or corporation with its own funds. Again, if Local 562 were to provide the standards, the separateness of such a fund need be nothing more than a separate ledger and bank account.

In sum, the opinion of the Court today, adopting an interpretation of § 610 at variance with its language and purpose, goes a long way toward returning unions and corporations to an unregulated status with respect to political contributions. This opening of the door to extensive corporate and union influence on the elective and legislative processes must be viewed with genuine concern. This seems to me to be a regressive step as contrasted with the numerous legislative and judicial actions in recent years designed to assure that elections are indeed free and representative.

I would affirm the judgment below.