**KENTUCKY REGISTRY OF ELECTION FINANCE, Appellant,**

v.

**LOUISVILLE BAR ASSOCIATION, Andrew E. F. Anderson, Individually, and as Representative of a Class Consisting of all Registered Voters in Jefferson County, Kentucky, Eligible to Vote for Judicial Candidates at the 1977 Elections, Appellees.**

Court of Appeals of Kentucky.

Original Opinion Withdrawn and Reissued March 30, 1979.

Opinion Rendered April 7, 1978.

Allen Prewitt, Jr., Frankfort, for appellant.

William H. Gorin, Frankfort, Victoria Ann Ogden, William T. Warner, Louisville, for appellees.

Before HOWERTON, WILHOIT and WINTERSHEIMER, JJ.

HOWERTON, Judge.

The Kentucky Registry of Election Finance, hereinafter referred to as "Registry," appeals from a declaratory judgment which held that the Louisville Bar Association, hereinafter referred to as "Bar Association," could publish the results of its judicial qualification poll, with certain restrictions, by use of an advertisement paid from its corporate funds. The Registry argues (1) that KRS Chapter 121 and § 150 of the Kentucky Constitution prohibit the expenditure of any corporate funds for the direct or indirect benefit of any candidate for public office, and (2) that publication of the results of a poll of lawyers aids in the election of the favorites of the poll in violation of the Corrupt Practices Act.

In defense of the judgment of the trial court, the Bar Association argues (1) that it has a duty to advise the lay public of the qualifications of candidates for judicial office, (2) that publication of a poll concerning qualifications of all candidates is not presented in support of any one candidate, and (3) the state's interest in preserving the integrity of elections and avoidance of corrupt practices does not justify the denial of the right of the Bar Association to publish and the voters to receive the information. The Bar Association also points out that the judgment required that any advertisement be in a "proper, dignified, and tasteful form in accordance with the requirements of the American Bar Association Code of Professional Responsibility; and further provided that any such paid advertisement shall not contain any language which in actuality, or upon fair construction, endorses, expresses a preference for, or advocates the election of any judicial candidate."

The controversy began when the Bar Association requested an interpretation by the Registry of the legality of a publication of the poll by means of a paid newspaper ad. The registry issued an opinion to the effect that the dissemination of the results of the poll through the news media would not be prohibited, but that publication by means of a paid newspaper ad would violate certain provisions of the statute. Thereafter, the Bar Association sought a declaratory judgment. The case was submitted to the trial court on the pleadings and oral arguments.

The appropriate statute in question is KRS 121.025. It provides in part:

No corporation, and no officer or agent of a corporation on its behalf, shall contribute, either directly or indirectly, any money, service or other thing of value towards the nomination or election of any state, county, city or district officer, or pay, promise, loan or become pecuniarily liable in any way for any money or other valuable thing on behalf of any candidate for office at any election, primary or nominating convention held in this state.

.  .  .

The appropriate portion of § 150 of the Kentucky Constitution reads:

.  .  .  and if any corporation shall, directly or indirectly, offer, promise or give, or shall authorize, directly or indirectly, any person to offer, promise or give any money or anything of value to influence the result of any election in this state, or the vote of any voter authorized to vote therein, or who shall afterward reimburse or compensate in any manner whatever, any person who shall have offered, promised or given any money or other thing of value to influence the result of any election or the vote of any such voter, such corporation, if organized under the laws of this Commonwealth, shall, on conviction thereof, forfeit its charter and all rights, privileges, and immunities thereunder;  .  .  .

.      .      .      .      .

The language of the statute and the Constitution is simple and quite clear. There are no provisions for any exceptions, includ-

ing incorporated bar associations. Contributions from corporate funds which directly or indirectly promote a candidate for public office are prohibited.

The Bar Association did not attempt to establish any committee for soliciting and using voluntary contributions of its members, which is apparently permissible. *Pipefitters Local Union 562 et al. v. United States*, 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972). Also, such contributions are not expressly prohibited by the Kentucky Corrupt Practices Act. Furthermore, the Bar Association did not register as a committee for any particular candidate, which is required if a group supports a candidate.

The trial court specifically found that the "intent, and primary and principal effect of the . . . publication of the results of its judicial poll is to inform the electorate of the qualifications of judicial candidates, in an objective manner without preferential declaration or endorsement of any such candidate." We do not determine this finding to be clearly erroneous, but for the sake of deciding and discussing this case, we will concede that publication of a poll of any kind could provide at least some indirect help to the leader or winner. We have, therefore, agreed with everything the Registry has had to offer by way of fact and argument in its favor.

What then does the Bar Association present to offset the case of the Registry? The first argument relates to Canon No. 8 of the American Bar Association Code of Professional Responsibility which is entitled, "A Lawyer Should Assist in Improving the Legal System." It is true that lawyers are in a unique position to evaluate the qualifications for judicial candidates, and they should assist the legal system and the general public by supporting good candidates and making known the truth about their qualifications. They may do this alone or collectively through an association. The association must comply with any laws pertaining to incorporated organizations, however.

The Code of Professional Responsibility may explain why the Bar Association conducted the poll and desired to publish it, but the code alone cannot justify the act. The code is primarily a guide for lawyers in the way they must conduct themselves, and it is an aid to them in developing true self-discipline and professionalism. It is no more appropriate for a bar association to assist in informing the public regarding the qualifications of judicial candidates than it would be for a medical association to inform the public regarding qualifications of candidates for the office of coroner, or for an association of C.P.A.'s to run an advertisement on the merits of candidates for state auditor.

For the purposes of this decision, we have conceded that the publication of the poll did involve the expenditure of corporate money, and it did benefit one or more of the candidates, at least indirectly. We must then ask, was this activity in actual violation of the true meaning and intent of the Kentucky Corrupt Practices Act and the Kentucky Constitution? For the reasons hereinafter expressed, we conclude that it would not be a violation under the facts in this case, if the paid advertisement was presented according to the terms of the judgment of the trial court. An even more basic question is whether or not the restrictions on free speech and free press sought to be imposed by and through KRS 121.025 and § 150 of the Kentucky Constitution abridge the rights that the First Amendment of the U. S. Constitution was meant to protect? At least as to the facts and circumstances in this case, we conclude that they do.

The Registry cited *LaBelle v. Hennepin County Bar Association*, Minn., 206 Minn. 290, 288 N.W. 788 (1939) as "the leading case in this country with respect to political activities by incorporated bar associations." *LaBelle* does involve many similarities with this case. The Hennepin County Bar Association was permitted to conduct a judicial preference poll, and it was also permitted to publish the results through a press conference without being in violation of the Minnesota Corrupt Practices Act. Our Regis-

try is of the opinion that such activity is also lawful under the Kentucky Corrupt Practices Act, but that it would be unlawful to publish the results of the poll by way of a paid advertisement. The Minnesota court never reached the question of a paid advertisement in *LaBelle*.

The Bar Association cites *Pecora v. Queens County Bar Association*, N.Y., 46 Misc.2d 530, 260 N.Y.S.2d 116 (1965) as its "leading case." The Queens County Bar Association established minimum qualifications for all judges, together with a method of evaluating candidates. The evaluations were published, and in some cases certain candidates were actually endorsed by the association. A judicial candidate brought suit alleging that the action of the Bar Association violated the election laws of New York. The court examined the purpose of the statutes and found that they were for the prevention of inordinate corporate influence on elections and not for interference with otherwise legitimate and authorized activities in the public interest. The court also reasoned that the statutes were penal in nature, and that they thus required a strict and narrow construction. The Queens County Bar Association was found to be performing a public function in accordance with its own canons, and acting with a primary purpose of aiding the administration of justice by seeking the election of qualified judges.

KRS 121.990 provides severe penalties and sanctions upon corporations and their officers who violate KRS 121.025. Section 150 of the Kentucky Constitution is also penal in nature. Only a very strict interpretation of the Corrupt Practices Act would find that the Bar Association was in violation under the circumstances of this case. We do not strictly construe the statute against the Bar Association, but against the Commonwealth. Also, when a state regulation such as the Corrupt Practices Act seeks to infringe on fundamental First Amendment rights in the interest of advancing a legitimate state interest, the courts require that the regulation be narrowly drawn to accomplish the purpose for which it is intended. *Keyishian v. Board of*

*Regents of the University of New York*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). The courts also insist that there be what is characterized as a "relevant correlation" or "substantial relation" between the governmental interests involved and the restrictions sought to be imposed. *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

In this case, the Registry seeks to enforce the state's interest of preserving the integrity of the election process by prohibiting paid publications, but not by prohibiting free publications so long as a free press release is available. This seems to be a distinction without a difference. The Registry has not made any explanation or presented any rationalization as to how the mere publication by paid advertisement of the results of the judicial qualification poll will adversely affect the integrity of the electoral process while the publication of the results by a press conference will not. We find no "relevant correlation" or "substantial relation" between the protection of the integrity of elections, or even the protection of minority interests in the Bar Association, and the prohibition of the paid publication of the poll. As far as corporate funds are concerned, the Bar Association had to spend money to take the poll, and if a paid staff member participated in a press conference to release the results, this too, would involve some expense.

■ Publication of the results of the Bar Association poll, by paid advertisement or press conference, as well as the receipt of the information by the appellee, Anderson, and the class of voters he represents, are fundamentally protected rights under the First and Fourteenth Amendments to the Constitution of the United States, as well as under § 1 of the Kentucky Constitution. It is well established that paid advertisements, even those involving "commercial speech" are entitled to First Amendment protection. *New York Times Company v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The protection also extends to the right of the public to receive information and ideas.

*Virginia State Board of Pharmacy v. Virginia Citizens' Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

█ Any time free speech and free press are to be suppressed, the reasons for such suppression must be subjected to close scrutiny. The burden is on the government to show the existence of such an interest. *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In this case, the Registry has offered no reason why the publication of the poll may not be made, except that it is in violation of a narrow interpretation of the statute and the constitution because corporate funds were involved in the payment of the advertisement.

Perhaps the best and most recent authority on this subject is *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). At the outset, we will note that the *Bellotti* case may be distinguished from this action on several grounds. The primary distinguishing factor is that the *Bellotti* case was concerned with a corporation spending its own funds to speak out on an issue it felt would affect its business. The issue was to be voted on by Massachusetts voters. In the case before this court, we are concerned with corporate funds being used to advertise an opinion poll regarding the qualifications of judicial candidates to be elected by Kentucky voters. The principles discussed in *Bellotti*, however, are important and pertinent in our case. One principle was that the inherent worth of protected speech is not affected by reason of its emanating from a corporate source. "If the speakers here were not corporations, no one would suggest that the State could silence their proposed speech. It is the type of speech indispensable to decisionmaking in a democracy, and this is no less true because the speech comes from a corporation rather than an individual." *Bellotti, supra*, at 777, 98 S.Ct. at 1416.

We have an additional concern when we consider the narrow interpretation requested by the Registry. If we should decide that the action of the Bar Association violates the Corrupt Practices Act, we might also have to consider that editorials in favor of a particular candidate or issue by a corporately owned newspaper would also be proscribed. Expenditure of corporate funds in the publication of the results of any poll involving political candidates or public issues might also be illegal. Chief Justice Burger, in a separate concurring opinion in *Bellotti, supra*, expressed similar concerns. The Chief Justice stated that "a disquieting aspect of Massachusetts' position is that it may carry the risk of impinging on the First Amendment rights of those who employ the corporate form—as most do—to carry on the business of mass communications, particularly the large media conglomerates." *Bellotti, supra*, at 796, 98 S.Ct. at 1426. The Chief Justice made it quite clear that freedom of the press and freedom of speech apply not only to individuals but to corporations and "any definable category of persons or entities: it belongs to all who exercise its freedoms." *Bellotti, supra*, at 802, 98 S.Ct. at 1429.

█ The purpose of both the constitutional and statutory provisions appear to be for the prevention of the exertion of unwarranted and perhaps unwholesome influence over political affairs by corporations formed for profit. These corporations often have at their disposal large sums of money capable of being used to further corporate fortunes through promoting the aspirations of selected candidates. The activities of the Louisville Bar Association in this case clearly do not fall within the conduct sought to be avoided by our laws. There has been no corruption of candidates or vote buying by corporate contributions, and we cannot see any need for protection of the individual members of the Bar Association in this situation.

█ Without a greater showing of danger to the public interest than has been shown to exist in this case, we must conclude that the proposed application of KRS 121.025 and § 150 of the Kentucky Constitution prohibiting the expression of thought through the Bar Association's paid advertisement would be incompatible with the freedoms secured by the First Amendment

of both the Kentucky and the United States Constitutions. Specifically, we decide that with a proper interpretation of KRS 121.025 and § 150 of the constitution, neither was intended to prohibit the paid publication as provided for in the judgment of the trial court; but, if we were unable to reach that conclusion, we would be compelled to reach the same result on the basis of the First Amendment issue.

The judgment of the Franklin Circuit Court is affirmed.

WILHOIT, J., concurs.

WINTERSHEIMER, J., dissents.

WINTERSHEIMER, Judge, dissenting.

I respectfully dissent.

KRS 121.025 and the Kentucky Constitution, Section 150, specifically prohibit the use of corporate funds, either directly or indirectly, for the nomination or election of any state officer, including judicial officers. These statutory and constitutional sections are absolute and do not provide for any exceptions. KRS 121.025 is a simple and clearly worded statute which does not lend itself to any other interpretation because of the plainly stated language used by the legislature. It is the obligation of the courts to uphold the clear language of the law and not to impose unnecessary "judicial legislation" by means of interpretation of what has been clearly defined by statute.

No challenge is made by the Registry of Election Finance to the promulgation of the Bar poll by means of a press conference or press release, or by other internal or external means. The sole objection by the regulatory agency is the use of corporate funds in contravention of Kentucky law.

The need for information by the voting public on all public questions is abundantly clear. To apply the language used by Justice Rehnquist in his dissent in the case of *Bellotti, supra,* the free flow of information is in no way diminished by the regulatory requirement of legislation here. The meritorious goal of a better informed electorate does not justify the avoidance of the clear meaning of the law. Lawyers and legal organizations have the highest obligation to observe the letter of the law and its spirit.

This Court can only decide what is immediately before it. We cannot indulge in speculation as to what would result from a challenge to other types of corporate political activity. This Court and the American tradition of jurisprudence clearly respect the rights of the press to free expression, but to insert the fallacious issue of freedom of the press in this case is totally unnecessary.

Here, the solution is relatively simple and could be achieved by the formation of a committee for the express purpose of informing the electorate of the Association's poll results. Additionally, the regulations could be amended administratively or by legislative action.

Philosophically, I would agree with the conclusions in an article in the American Bar Journal, June 1978, Page 814, that only real persons should debate and determine public policies. Treatment of corporations as persons is a legal fiction.

Because it seems that both parties are well-intentioned and the election in question is long since over, the resolution of this dispute might be better accomplished by arbitration and compromise rather than by involving the courts in such a question.