Dear Senator McCabe:
You have requested our opinion on the constitutionality of Senate Bill 555, "Campaign Contributions — Casino Gaming." Our opinion is that Senate Bill 555 is constitutional.
 I Scope of Senate Bill 555
Senate Bill 555 would amend the Election Code to add the following new prohibition: "A person who makes a contribution, either directly or indirectly, is not eligible to receive from the State any form of license or permit to conduct casino gaming for a period 3 years from the date the person made the contribution."[1]
We begin by acknowledging some uncertainty about the intended scope of Senate Bill 555. The term "casino gaming" is not defined. Under one possible interpretation, the term refers to any venue where casino games are licensed to be played. For example, county-licensed "casino nights" are legal in Prince George's County. Article 27, § 258B(c). A "casino night," undertaken for the benefit of certain charitable and civic organizations, is an event "at which card games, wheels of chance, or roulette are played and money winnings or tokens redeemable and money are awarded as prizes." Article 27, § 258B(c)(1)(ii). While these events are sporadic, rather than continuous, each such event includes gambling activity that might be thought to fall within the term "casino gaming."
Yet your letter requesting this opinion describes the bill, of which you are a co-sponsor, as one rendering contributors "ineligible to receive a license to operate a casino in Maryland within three years of the date of the contribution." You also refer to the increasing popularity nationally of casino gambling in venues like "riverboats, or [other] free standing facilities. . . ." Hence, we shall assume that Senate Bill 555 means "casino gaming" of the kind offered by full-scale casinos of the Las Vegas or Atlantic City type: venues dedicated to a variety of gambling activities, open to the public nearly continuously, and aimed at drawing large crowds from a wide market area.[2]
There is presently no such "casino gaming" in Maryland.[3] Under this construction of Senate Bill 555, the bill would affect only hypothetical future employment possibilities. If casino gaming of this kind were legalized in the future, then those who made political contributions would be barred from obtaining a license for three years after making the contribution.
 II Future Employment Restriction
Under Senate Bill 555, someone who makes a political contribution would thereby lose for three years a particular, albeit hypothetical, future employment opportunity — casino gaming licensee.
In Attorney General v. Waldron, 289 Md. 683, 426 A.2d 929
(1981), the Court of Appeals held unconstitutional, on equal protection grounds, a law that prohibited certain judicial retirees from practicing law. This restriction was variously characterized by the Court in these strong terms: It imposed a "permanen[t] preclu[sion] from the practice of [a judge's] chosen profession"; it "flatly denied one the right to engage in the practice of the profession for which he is otherwise qualified"; it "impinged on "important private rights"; it "deprived . . . retired judges . . . of the right to pursue their calling in life"; it "imposed a severe burden"; and it "denied persons a basic and important right." 289 Md. at 716, 717, 722, 727, and 727-28.
The Court would, we believe, take a very different view of Senate Bill 555. Far from being a "chosen profession" for which someone could be "otherwise qualified," the occupation subject to the restriction, casino gaming licensee, does not presently exist. If it came into being, the ban on licensing of political contributors would amount to a regulation of entry expressly preserved in Waldron. 289 Md. at 717. Furthermore, the State interest in averting the potential effect of casino money on politics, discussed in more detail in Part III below, would justify the restriction in any event.
 III First Amendment Considerations
If the General Assembly legalized casino gaming, Senate Bill 555 would put a licensee to a choice: forgo political contributions or lose one's license. In practical effect, the bill would then be a prohibition on contributions. Any casino gaming licensee would decline to make contributions so as not to jeopardize this form of livelihood. Hence, we shall analyze the bill as if it were a flat prohibition on contributions by licensees in this industry, for that is its practical effect.
The making of a political contribution involves the right of free expression and free association protected under the First Amendment. Citizens Against Rent Control v. Berkeley,454 U.S. 290, 299-300 (1981); Buckley v. Valeo, 424 U.S. 1, 5
(1976).[4] Moreover, a ban on contributions — or, here, a penalty for making contributions that is tantamount to a ban — is a heavy burden on this particular manifestation of First Amendment rights.
Yet, "[n]either the right to associate nor the right to participate in political activities is absolute . . . ." UnitedStates Civil Service Comm'n v. National Ass'n of Letter Carriers,413 U.S. 548, 567 (1973) (upholding Hatch Act restriction on political activities). As the Supreme Court observed in its decision upholding contribution limits, "[e]ven a significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." Buckley v. Valeo,424 U.S. at 25 (internal quotation marks omitted). See also Eu v. SanFrancisco County Democratic Central Committee, 489 U.S. 214, 222
(1989); FEC v. National Conservative PAC, 470 U.S. 480, 496
(1985).
In Petition of Soto, 565 A.2d 1088 (N.J.Super. 1989), cert.denied, 583 A.2d 310 (N.J.) cert. denied, 496 U.S. 937 (1990), the Appellate Division of the New Jersey Superior Court upheld the constitutionality of a statute barring certain casino employees from making political contributions. The New Jersey court noted that, in Buckley, the Supreme Court had identified the governmental interest in preventing corruption or its appearance as sufficient to justify limitations on campaign contributions. As strong as this interest is generally, it is all the stronger when the industry that is the source of potential contributions is "`rife with evil . . . .'" 565 A.2d at 1094 (quoting trial court). The appellate court also quoted a report about casino gambling to the effect that "contributions by casino licensees, both corporate and individual, give the appearance of attempting to `buy' political influence and favoritism and in fact have the very real potential for causing such favoritism to occur."565 A.2d at 1096.[5]
Further, the New Jersey court held, no remedy short of an outright prohibition would be sufficient to further this state interest: "Given the acknowledged vulnerability of the casino industry to organized crime and the compelling interest in maintaining the public trust, not only in the casino industry but also the governmental process which so closely regulates it, . . . there is no viable alternative available to prevent the appearance of, or actual, corruption of the political process in New Jersey."565 A.2d at 1098. Cf. Kentucky Registry of Election v. LouisvilleBarAss'n, 579 S.W.2d 622 (Ky.App. 1979) (while striking down corporate contribution ban as applied to publication of poll results in judicial elections, court recognized risks of "corruption of candidates" and "unwholesome influence over political affairs"); Advisory Opinion on Constitutionality of 1975PA 227, 242 N.W.2d 3, 13 (Mich. 1976) (in upholding corporate contribution ban in candidate elections, court pointed to "attempts at influence or importunity which might be exerted upon a successfully elected candidate by a contributing corporation").
Casino gaming is an industry that generates extraordinarily large sums of money. When legalized at all, the industry is heavily regulated. For much the same reason, the liquor industry is likewise heavily regulated. Thus, it is significant that a complete ban on political contributions by liquor licensees has also been upheld. In Schiller Park Colonial Inn, Inc. v. Berz,349 N.E.2d 61 (Ill. 1976), the Illinois Supreme Court held that the state interest in avoiding the corrupting effect of liquor interests on the political process justified a statute prohibiting political contributions by liquor licensees. Noting that politicians "may have influence or power which could be used to affect various actions concerning the liquor industry," the Illinois court upheld the legislative attempt to "prevent liquor licensees from obtaining influence in the area of liquor regulation . . . [by] proscribing the giving of campaign contributions by liquor licensees to any candidate."349 N.E.2d at 66-67.[6]
Senate Bill 555 avoids unnecessary abridgement of First Amendment rights. It does not affect licensees' right to engage in direct political speech or to make independent expenditures. Nor, under the construction adopted in this opinion, does the bill reach gambling licensees beyond the uniquely dangerous category of casinos.[7]
 IV Conclusion
In summary, it is our opinion that Senate Bill 555 is constitutional on its face.[8]
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Jack Schwartz Chief Counsel Opinions Advice
[1] A "contribution" is "the gift, transfer or promise of gift or transfer of money or other thing of value to any candidate, or the candidate's representative, or a representative of any political party or partisan organization to promote or assist in the promotion of the success or defeat of any candidate, political party, principal or proposition submitted to a vote at any election." Article 33, § 1-1(a)(5)(i).
[2] "Casino gaming" of this kind was the subject of this office's detailed report to the Joint Executive-Legislative Task Force to Study Commercial Gaming Activities in Maryland. See J. Joseph Curran, Jr., The House Never Loses and Maryland Cannot Win:Why Casino Gaming is a Bad Idea (October 16, 1995) (hereafter cited as "Casino Gaming Report"). If the bill is intended to have a broader scope, we suggest that the term "casino gaming" be defined. If the scope of the bill were enlarged, the issues discussed in this opinion would require reassessment.
[3] Article 27, § 241 prohibits the keeping of "any gaming table or other place of gambling in this State. . . ." A "gaming table," under Article 27, § 244, includes "[a]ll games, devices and contrivances at which money or any other thing shall be bet or wagered . . . ." Slot machines are separately banned. Article 27, § 264B.
[4] Some passages in Buckley suggest a lesser First Amendment status for political contributions, compared to other political activities. See 424 U.S. at 20-21. Because Senate Bill 555 is constitutional even if contributions are accorded undiluted First Amendment status, we need not further explore the case law touching on their precise status.
[5] Further discussion of this danger may be found inCasino Gaming Report at 46-47.
[6] Nor are contributions bans unheard of in other contexts. For example, federal law prohibits a federal contractor from making political contributions. See 2 U.S.C. § 441c.
[7] The bill's line-drawing might be thought to raise an equal protection problem. That is, the bill effectively bars political contributions from one segment of the gambling industry casino gaming licensees — while imposing no comparable restriction on persons engaged in other commercial gambling activities that are authorized by law. These include parimutuel wagering licensees, see § 11-302 of the Business Regulation Article; commercial bingo licensees, see Article 16, Title 2, Subtitle 3 of the Anne Arundel County Code; and commercial tip jar licensees, see Article 27, 255C. However, the General Assembly could reasonably conclude that the volume of money generated by casino gaming and the history of criminal activity associated with this industry pose a special risk of corruption. This distinction would suffice for purposes of equal protection review.
[8] For purposes of assessing the bill's facial constitutionality, we need not resolve whether the bill could constitutionally be applied to contributions in referendum elections, rather than candidate elections. Compare Austin v.Michigan Chamber of Commerce, 494 U.S. 652 (1990) (upholding prohibition of corporate expenditures in candidate election) withFirst National Bank of Boston v. Bellotti, 435 U.S. 765 (1978) (striking down prohibition of corporate expenditures in referendum election). See also Citizens Against Rent Control v. Berkeley,454 U.S. 290 (1981) (striking down $250 individual contribution limit in ballot measure campaign).
 *Page 20